UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| **TARA KING**, **ED.D.**, individually and on behalf of her patients, **RONALD NEWMAN**, **PH.D.**, individually and on behalf of his patients, **NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY (NARTH)**, **AMERICAN ASSOCIATION OF CHRISTIAN COUNSELORS (AACC)**,<br><br>   Plaintiffs,<br>v.<br><br>**CHRISTOPHER J. CHRISTIE**, Governor of the State of New Jersey, in his official capacity, **ERIC T. KANEFSKY**, Director of the New Jersey Department of Law and Public Safety: Division of Consumer Affairs, in his official capacity, **MILAGROS COLLAZO**, Executive Director of the New Jersey Board of Marriage and Family Therapy Examiners, in her official capacity, **J. MICHAEL WALKER**, Executive Director of the New Jersey Board of Psychological Examiners, in his official capacity; **PAUL JORDAN**, President of the New Jersey State Board of Medical Examiners, in his official capacity,<br><br>   Proponents of A3371s. | Case No. _____ |

---

**DECLARATION OF DR. JOSEPH NICOLOSI**

  I, Joseph Nicolosi, hereby declare as follows:

Declaration of Dr. Joseph Nicolosi - 1

1. I am over the age of 18 and am submitting this Declaration as expert testimony on behalf of NARTH members and the NARTH Board of Directors. The statements in this Declaration are true and correct and if called upon to testify to them I would and could do so competently.

2. I am submitting this Declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction.

## BACKGROUND

3. I have been a licensed psychologist in California since 1980. I have a Bachelor of Arts Degree in Psychology from Long Island University. I received my Masters of Arts degree in Psychology from the New School for Social Research and my Doctor of Philosophy in Clinical Psychology from the California School of Professional Psychology. I am the Founder and Clinical Director of Thomas Aquinas Psychological Clinic in Encino, California, which is a clinic providing mental health counseling currently to 135 clients. Ninety percent of those clients are individuals struggling with unwanted same-sex attractions, behaviors, and identity, and sixty percent are teenagers. While the Clinic specializes in helping people with unwanted same-sex attractions, behaviors, and identity, the four mental health professionals providing service at the clinic do counsel on any issue for which the client is seeking help.

4. I am one of the three founding members and a former president of the NARTH, which is a professional, scientific organization that offers hope to those who struggle with same sex attractions by providing information, counseling, research, and referrals. I have published numerous books, articles, and other scholarly works on the topic of homosexuality and the course of treatment for those individuals who seek to reduce or eliminate their unwanted same-sex attractions. In my practice, I specialize in the treatment and counseling of males who struggle with unwanted same-sex attractions.

5.      In addition to the numerous books and scholarly articles that I have written and the extensive education I have received in the United States, I have also participated in numerous international training seminars occurring all over the world in places including Germany, Italy, England, Mexico, and Poland.

6.      My background and experience in the field of clinical psychology and a list of my published articles, books, and book chapters are described in my curriculum vitae, which is attached to this Declaration as Exhibit A.

## DESCRIPTION OF PRACTICE AND INFORMED CONSENT

7.      Prior to engaging in SOCE counseling with patients, I and most NARTH members provide clients with a consent form that outlines the nature of the treatment, the potential benefits and risks, including the fact that some psychotherapists believe that sexual orientation cannot or should not be changed, and informs the client that success in any method of psychotherapy is not guaranteed and could potentially be harmful. In my consent form, I explicitly state that I do not, nor does anyone at my clinic, provide gay-affirming treatment and that clients should seek an alternative therapist to help them if that is their stated objective.

8.      I and most NARTH members also explain that if at any point in the course of the client's therapy, the client decides that he no longer wants therapy for unwanted same-sex attractions, behaviors, or identity, then he should inform the counselor immediately because a client's course of treatment should always be based on his objectives. Related to this, I explain that if the client decides during the course of SOCE counseling that he wants therapy that affirms his same-sex attractions, behaviors, or identity, then it would be best for the client to seek an alternative therapist.

9. I and most NARTH members explain to our clients that the nature of SOCE counseling is such that many people report benefits from the counseling, but that it can invoke initial feelings of stress and anxiety; that many experience a reduction in same-sex attractions, behaviors, or identity; and that often a person will continue to experience some level same-sex attractions, behaviors, or identity even after therapy. I explain that as with other issues people face in their lives, many people report that their recognition of their heterosexual potential and identity is a lifelong process that continues with them after therapy.

10. My SOCE counseling consists of discussions with the client concerning the nature and cause of their unwanted same-sex sexual attractions, behaviors, or identity; the extent of these attractions, behaviors, or identity; assistance in understanding traditional, gender-appropriate behaviors and characteristics; and assistance in fostering and developing those gender-appropriate behaviors and characteristics.

11. Most of the patients with unwanted same-sex sexual attractions, behaviors, or identity who seek SOCE do so to develop and foster healthy, heterosexual relationships and seek the elimination or reduction of their unwanted same-sex sexual attractions, behaviors, or identity. I have had many clients who, through SOCE counseling, have been able to succeed in reducing their unwanted same-sex attractions, behaviors, or identity and have reported a marked increase in their recognition of their heterosexual potential.

12. I have also had clients who decided that they wanted to remain in the homosexual lifestyle, but report that SOCE counseling helped them to understand the nature of their homosexual identity and, as a result, were able to better cope with that identity after SOCE counseling. These same clients who decide to remain in the homosexual lifestyle have reported that they experienced no harm as a result of SOCE counseling.

### THE A3371 SOCE BAN IS NOT SUPPORTED BY THE REPORT OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION TASK FORCE ON APPROPRIATE THERAPEUTIC RESPONSES TO SEXUAL ORIENTATION

13. The underlying foundation for a ban on SOCE as set forth in A3371 is the unfounded reliance by A3371 proponents upon the Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (the "APA Report").

14. The APA Report, however, has countless methodological flaws and reaches erroneous conclusions because of the ideological persuasion of the Task Force members who drafted it. The first evidence of the flaws in the methodology behind the APA Report is that it included no practitioners of sexual orientation change efforts ("SOCE") counseling. In fact, the APA rejected every practitioner of SOCE counseling that applied for membership on the Task Force. Many of the applicants that the APA rejected were prominent scholars in the field of same-sex attractions, behaviors, and identity, and SOCE counseling, including A. Dean Byrd, Ph.D., George Rekers, Ph.D., Stanton Jones, Ph.D., Mark Yarhouse, Ph.D., and me.

15. The APA violated long-established scientific principles by intentionally rejecting all practitioners of SOCE and prohibiting the participation of individuals with differing views, values, and practice. The scientific methodology used by the Task Force is flawed because the only voices included in the APA Report are well known for their disapproval of any efforts by homosexual individuals to seek change, even when those individuals seek such change in order to live in accordance with their sincerely-held religious or moral beliefs. Even the proponents of anti-SOCE legislation like A3371 attest to the need for objective and unbiased opinion when conducting a study of this nature.

16. The scientific bias of the APA Report is evidenced by four specific factors. First, the APA Report failed to review the well-documented psychological and medical health risks

associated with homosexual and bisexual behavior. Neil E. Whitehead, *Homosexuality and Co-Morbidity: Research and Therapeutic Implications*, The Journal of Human Sexuality II, 156 (2010) (recent studies have found "essentially the same suicide rates" for same-sex attracted people in the US as other countries with decades of acceptance of people with same-sex attractions, behaviors, or identity) (A copy of this Article is attached as Exhibit B). Second, the APA Report failed to consider the factors associated with the development of homosexual attractions and merely assumed that homosexuality is as developmentally normal as heterosexuality. Yet, the APA Report would concede that the causes of homosexuality are unknown. Third, the APA Report did not study individuals who reported success from SOCE counseling, apparently because it considered change unnecessary and undesirable. Fourth, the APA Report elevated the standard for success in treatment for unwanted same-sex attractions, behaviors, or identity, and this standard is far higher than the standard for success applicable to any other course of psychological treatment. Many other courses of treatment also have notorious reputations for resistance to success, specifically courses of treatment for narcissism, borderline personality disorder, and alcohol and drug abuse, but there is no debate about the usefulness of these courses of treatment. "The Task Force also criticized SOCE studies on the grounds that the studies had high dropout rates. However, many treatment cohorts have high dropout rates; take, for example, a drug and alcohol treatment program (Polich, Armor, & Baker, 1981)." James E. Phelan, et al., A Critical Evaluation of the *Report of the Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, Resolutions, and Press Release, The Journal of Human Sexuality IV, 46 (2012) (A copy of this article is attached as Exhibit C). Nevertheless, the APA Report ignored any potential comparison to these treatment options and also ignored the fact that psychologists continue to engage in these courses of treatment despite

their uncertain outcomes. Additionally, these courses of treatment all continue with the blessing of the APA and all of the other professional organizations that criticize SOCE counseling.

17. Proponents of A3371 seek to increase the burden on SOCE counselors by defining success in any course of treatment as requiring that it must achieve its intended goals all or most of the time. If this standard applied to other forms of psychological treatment, then many widely-used and noncontroversial courses of treatment would not qualify as effective. As mentioned in the previous paragraph, there are a number of courses of treatment that have reputations for resistance to success, and no one seeks to apply this heightened standard of near perfection to these courses of treatment. That the APA Report singled out SOCE alone for this absurd standard is itself strong evidence of the bias of its members. Indeed, there would be no effective psychological courses of treatment if all courses of therapy were subjected to the standard espoused by the APA Report.

18. The APA Report flatly contradicts many points that specifically refute the assertions made by proponents of A3371. On page two, the APA Report states that none of the recent research, which are all studies from 1999-2007, meet the methodological standards for determining the efficacy, safety, *or dangers* of SOCE counseling. This undermines the assertions of proponents of A3371 that SOCE counseling is harmful to minors. Just as the research allegedly fails to prove SOCE's *efficacy*, the APA Report concedes it fails to prove any concrete *harm*. See Ex. C, Journal of Human Sexuality IV at 57-58. Furthermore, on page 25, the APA Report concedes that there needs to be more research and analysis of the potential benefits or dangers of SOCE counseling. In fact, on page 42, the APA Report specifically found that there was a dearth of information based on sound scientific research concerning the safety of SOCE counseling. The dearth of scientific study prevents blanket assertions by proponents of A3371

that SOCE counseling is in fact harmful to minors and should therefore be prohibited. This is reinforced on page 44 of the APA Report, which states that "[b]ecause of the lack of empirical research in this area, the conclusions must be viewed as tentative." Indeed, on page 11, the APA Report admitted that "recent research cannot provide conclusions regarding efficacy or safety."

19.     On page 18, the APA Report implies that by striving to live a life consistent with their religious values, people with same-sex attractions, behaviors, or identity must deny their true sexual selves. This further implies that individuals with sincerely-held religious beliefs that lead them to seek a reduction or elimination of their unwanted same-sex attractions, behaviors, or identity will not experience organismic wholeness, self-awareness, and mature development of their personal identity. Those religious individuals who seek to live in conformity to their religious values are assumed to experience a constriction of their true selves because of a religiously imposed behavioral control. This false distinction, created by the APA Report, ignores the desire of many clients to live in congruence with the fundamental tenets of their sincerely-held religious and moral beliefs. For these individuals, the values they hold because of their religious beliefs are viewed as guideposts and sources of inspiration that help guide them on their pursuit of wholeness, and wholeness for these people can only be achieved by living in congruence with their religious beliefs.

20.     The APA Report seeks to diminish the beliefs of these individuals by suggesting that religious beliefs should be reconstructed to align with their unwanted same-sex attractions, behaviors, or identity rather than working to conform their sexual attractions, behaviors, or identity to their religious beliefs. On pages 72-73, the APA Report recognizes that many clients seek SOCE counseling because of their religious beliefs. On page 58, the APA Report then states that therapy is a "process of uncovering and deconstructing dominant worldviews and

assumptions with conflicted clients that enable them to redefine their attitudes toward their spirituality and sexuality." The APA Report ignores the fact that many people desire to elevate their religious beliefs above any unwanted same-sex attractions, behaviors, or identity and that they seek counseling to assist them with this goal. The APA Report states that counseling for individuals in this category should focus on "refram[ing] the religious beliefs to focus on aspects of faith that encourage love and acceptance of their child rather than on a religion's prohibitions."

21. The APA Report's position is based on the unproven assumption that homosexuality is inborn and immutable. *See* Ex. C, Journal of Human Sexuality IV at 57 (noting that the APA Report based its conclusions on an "*a priori* assumption that homosexuality is inborn and therefore immutable" which is unsupported by the APA's own statements). The APA's position dates back to the 1970s when "on the basis of emerging scientific evidence and encouraged by the social movement for ending sexual orientation discrimination, the American Psychological Association and other professional organizations affirmed that homosexuality per se is not a mental disorder." *See* APA Report at 11. This undermines the basis for A3371 and the APA Report's conclusions because it reveals that the APA's change in position and its assumptions that homosexuality is immutable were based on political and social pressure, not concrete scientific evidence.

22. On page 30, the APA Report defines sexual orientation as "an individual's patterns of sexual, romantic, and affectional arousal and desire for other persons based on those persons' gender and sexual characteristics." The APA Report does not define sexual orientation as *enduring*, which reveals that these definitions are not based on any universally recognized or consistently applied scientific standard. Additionally, on page two, the APA Report recognized

Declaration of Dr. Joseph Nicolosi - 9

that "[s]ame-sex sexual attractions and behavior occur in the context of a variety of sexual orientations and sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) is fluid or has an indefinite outcome." Given the mental health professions' inability to provide a concrete definition of sexual orientation, there is potentially no limit to what could fall into its definition. The vagueness in the understanding itself of what is encompassed by "sexual orientation" results in a variety of understandings of its meaning, and includes pederasty, which is a homosexual relationship between a young man and a pubescent boy outside his immediate family, or pedophilia, or a host of other paraphilias or fetishes. This presents a difficult problem for a licensed counselor tasked with complying with A3371 when the definition of "sexual orientation" is fluid and vague. In any event, A3371 provides no definition of "sexual orientation," leaving counselors to guess as to the meaning intended by the statute.

23.   Focusing on reframing an individual's religious beliefs is beyond the purview of psychological counseling, and it ignores the most fundamental principle of the profession—namely, that the client has the right to self-determination.  A3371 explicitly states that it is relying on the conclusions of the APA Report and the proponents and drafters of A3371 focus solely on the conclusions of it and other studies that are methodologically flawed. This reveals the flaws of  A3371 and specifically shows that it is aimed at reframing an individual's religious perspectives deemed antiquated or discriminatory and imposing an ideology on those individuals that do not wish to live in conformity with the view espoused by  A3371 and the APA. The APA Report also states on page 19 that "prejudices directed at individuals because of their religious beliefs and prejudice derived or justified by religion are *harmful* to individuals, society, and international relations." (emphasis added). This further reveals that the APA Report and A3371

attempt to elevate sexual orientation above a person's sincere religious beliefs, and shows that A3371 specifically targets those individuals that have religious beliefs opposed to homosexuality.

24. The assertions of A3371 proponents are based on the unsubstantiated belief that same-sex attractions, behaviors, or identity are the result of biology. The general position of A3371 proponents that "sexual orientation is tied to physiological drives and biological systems that are beyond the conscious choice" contradicts the APA's own public-disseminated information regarding sexual orientation and etiology, which says:

> There is no consensus among scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay or lesbian orientation. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, no findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or factors. Many think that nature and nurture both play complex roles. (APA, 2008b, p.2)

### IMMEDIATE AND IRREPARABLE HARM CAUSED BY A3371

25. A3371 will cause immediate and irreparable harm to New Jersey licensed counselors and clinics that focus on SOCE counseling, in that A3371 will prohibit them from continuing beneficial and successful courses of treatment with minor clients and force licensed counselors to stop speaking about SOCE treatment or risk losing their licenses. This law will immediately and directly harm the counselor's right to speak to and counsel clients in accordance with not only the counselor's religious and moral values, but with the clients' religious and moral values. The law will also immediately and directly infringe upon their clients' right to receive information.

26. Moreover, A3371's operative commencement will be a shocking disturbance to minor clients who are now in counseling. This counseling, which runs afoul of the prohibitions contained in A3371, consists solely of verbal discussion between the counselors and the clients

as individuals, exploring the clients' feelings and helping them align their feelings with their religious and moral beliefs. After August 19, 2013, a minor client must be informed that all that has been attempted is now illegal and unethical. There can be no further discussion regarding the client's own therapeutic goals and the therapeutic relationship upon which those goals were based to reduce or eliminate same-sex sexual attractions, behavior, or identity. The therapeutic alliance between the clients and counselors - established at the cost of great time, monetary expense, and trust - will be destroyed.

27.     When New Jersey licensed counselors are forced to terminate their SOCE counseling with minor patients, many of the minors will regress and will suffer adverse health consequences stemming from an inability to address their goal of recognizing their heterosexual potential.

28.     Some clients and their parents will have to seek out counselors who are not licensed and therefore not subject to the dictates of A3371. They might continue to receive the SOCE counseling they desire, but it will be administered by unlicensed professionals.

29.     As a clinical psychologist, my experience and opinion inform me that it is important for SOCE counseling to be engaged in by those therapists who have studied it and understand the benefits and potential risks.

30.     The practice of giving detailed information to minor clients and their parents satisfies the ethical requirements that a counselor provide all of the information that is reasonable for the client to make an informed decision concerning their individual course of treatment and that facilitates the autonomous client decision-making process. A3371 will cause New Jersey counselors to violate Section 3.10 of the American Psychological Association's Ethics Code ("APA Code") because they will be prohibited from even discussing a course of treatment, SOCE, that is part of the information that they are ethically required to provide to their clients.

Counselors would also be prohibited from even referring a client who wants to discuss SOCE therapy to a professional who can provide it.

31.   Compliance with A3371 will force New Jersey counselors to violate the informed consent mandates of Section 3.10 of the APA Code and probably also infringe ethical requirement outlined in General Principle E of the APA Code that a counselor allow the patient complete freedom to make a self-determined choice concerning his therapy. However, providing clients with unwanted same-sex attractions, behaviors, or identity with the treatment they desire automatically constitutes and ethical violation under A3371.

32.   Because of this impossible Catch-22, A3371 is certain to cause irreparable harm to the practice of New Jersey counselors by putting their professional license in jeopardy no matter how they proceed, and with no guidelines on how to resolve the conflict between A3371 and the ethical codes.

33.   A3371 will also cause New Jersey counselors to violate Section 3.06 of the APA Code by causing them to enter into a relationship where their objectivity is called into question because A3371 mandates that only one ideology—i.e., the State's ideology condemning SOCE—be shared in the counselor's office.

34.   A3371 also presents a significant problem for another element of SOCE practice and provides no guidance on whether it prohibitions apply to it. Specifically, regarding any YouTube and other videos on a counselor's website and on other websites that specifically address the issue of SOCE counseling. These videos have the potential to reach every minor in New Jersey. A3371's language prohibits all efforts that seek to reduce or eliminate same-sex attractions, behaviors, and identity, and it would seem that having videos on the Internet that advocate for SOCE counseling and provide information about where an individual can receive it might be

perceived as an effort that seeks to reduce or eliminate same-sex attractions, behaviors, or identity. Counselors do not know whether A3371 requires them to remove all of these videos from their websites, and request that they be removed from others. Also, it is virtually impossible to ensure that all such videos are removed, so if A3371 is found to apply to them, then a counselor could inadvertently be subject to disciplinary proceedings because of the viewing of a video that he or she thought had been removed from the Internet. Pamphlets and informative brochures on the websites would likewise pose the same problems.

35. Additionally, it is completely uncertain about whether a simple referral would constitute an effort seeking to reduce or eliminate same-sex attractions, behaviors, or identity that would violate A3371. Informing someone that such SOCE counseling is available at another location by another individual not subject to A3371 seems like it could be a violation, but A3371 provides no guidance on this matter, so a counselor is again faced with a dilemma of how to exercise his or her professional judgment. In short, A3371 provides no guidance on the seemingly innumerable applications of its prohibitions, which places counselors at constant risk of unknowingly being subject to losing their professional licenses. Their clients will suffer as well, since the counselors will not be able to confidentially counsel them on available options for their undesired same-sex attractions, behaviors, or identity.

### VAGUENESS OF A3371 AND ERRONEOUS ASSUMPTIONS OF PROPONENTS

33. The APA Report concluded that "[s]ame-sex sexual attractions occur in the context of a variety of sexual orientations and sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) is fluid or has an indefinite outcome." A3371 prohibits anyone from *under any circumstances* engaging *in any practice* that seeks to reduce or eliminate same-sex sexual attractions, behaviors, or identity or

attempts to change sexual orientation. This prohibition is virtually impossible to comply with because it is well understood in the mental health profession, and conceded by the APA Report, that sexual orientation is difficult to define and encompasses a number of factors, including behavior, practices, identity, and attractions. Given that this prohibition specifically deals with a concept the APA Report concluded was "fluid," counselors will ultimately be required to guess at what "practices" would be prohibited under this bill. Since "sexual orientation" includes pederasty and pedophilia, for example, a counselor counseling a client who has unwanted same-sex sexual attractions toward other younger minors or acts on such attractions (behavior), will be prohibited from a course of counseling designed to reduce or eliminate such attractions, behavior, or identity. Furthermore, a counselor may not counsel a minor victim of an adult pederast or pedophile that it is wrong to engage in sexual behavior with an adult of the same-sex.

34.     There are multiple meanings of "sexual orientation" among licensed mental health professionals. But how is one to define the "gay adolescent?" We might reasonably assume that the best way to determine if a teen is gay is by what the teen says about himself. Proponents of A3371 would agree that if a teen says he is gay, he is gay. But are we to believe him? What is the credibility of a teenager who, according to the new law, cannot be believed if he says his homosexual feelings do not represent his deepest sense of self, and he wants to change? How are we to define a teenager who has same-sex attractions, behaviors, or identity but does not believe his sexual behavior makes him gay? He believes that deep down he is a heterosexual, but has same-sex attractions, behaviors, or identity. Is it behavior or identity that defines his "gayness"? Counselors look more deeply into the teenager's motivations and recognize that any self-label may represent a variety of motivations that do not necessarily define his true sexual identity. A3371 would prohibit this inquiry, if the counselor's intent is to effect change in "sexual

orientation," whatever that may be. Moreover, same-sex sexual attractions, behaviors, and identity among minors often diminish or disappear spontaneously. It would be unethical for a licensed counselor to tell the client who is experiencing temporary unwanted same-sex sexual attractions, behaviors, or identity that such attractions, behavior, or identity is something the client should embrace. In not helping the client eliminate or reduce such attractions, behavior, or identity, the counselor might be pushing the client toward homosexuality, when in fact the client is heterosexual and merely experiencing a temporary period of homosexual attractions.

35.     Furthermore, A3371 permits "education and information" on SOCE but not the "practice" of SOCE. When does education and information on SOCE not become the practice of it? For example, a therapist may spend six months educating and informing the client of SOCE and how it might apply to the client. Session after session the therapist may give examples of how the client's behavior and feelings are explained by SOCE. What the client says about himself may prompt the counselor to respond: "Well, SOCE would explain your behavior as…", but ultimately, the counselor will have to guess as to whether the State of New Jersey would consider such counsel a violation of A3371. At any rate, no matter what the counselor says, the matter will be determined by how the client *perceives* what the counselor says. A counselor educating about SOCE could likely be perceived as counseling to reduce or eliminate same-sex sexual attractions, behaviors, or identity and thus be in violation of A3371.

36.     Despite this lack of clarity in the law itself, proponents of A3371 have previously attempted to establish an arbitrary and unrealistic distinction between "practices" of SOCE, versus a counselor's speech. In actual practice of psychotherapy, it is impossible to distinguish "practice of SOCE" from "speech." Psychotherapy is speech. The therapeutic relationship is talking and communication; verbal and non-verbal communication is the essential element of the

therapeutic process. Thus, licensed counselors will ultimately be required to guess at whether "practice" or "speech" would be prohibited under this law.

37. A3371 is not just about discussions of sexual orientation, but also about discussions about a person's behavior that is incongruent with a person's religious or moral values. Licensed counselors need the freedom to talk about a client's behavior in a manner that incorporates discussions of the client's religious faith or values. Counselors will be forced to guess at whether a discussion of behavior incongruent with one's beliefs and values is an effort to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, which could include mannerisms or speech under A3371. If a female client wanted to display more assertive male behavior or speech inconsistent with her gender, counselors would be prohibited from encouraging such behavior. The same is true when clients plead with a counselor to help them not to identify with a particular sexual orientation. If counselors are prohibited from such discussions, then their clients will face irreparable harm.

## OTHER ERRONEOUS FACTUAL ASSUMPTIONS BY PROPONENTS OF A3371

38. Proponents of A3371 continually repeat the shibboleth that the mental health associations no longer consider homosexuality a mental illness or disorder. That fact is irrelevant since it is the client's distress with same-sex attractions, behaviors, or identity and their right to seek treatment to reduce that distress which is the issue. Counseling does not depend on the client having a mental illness. Much of counseling involves stress that is not related to a mental illness. Counseling a client does not send a message or presume that a client has a mental illness.

39. Proponents of A3371 assert that minors face family rejection based on their sexual orientation, thereby creating especially serious health risks. Family rejection is not a necessary

outcome of SOCE. Rather, I and my colleagues who practice SOCE attempt to have parents accept their teen irrespective of their sexual orientation outcome.

40.     Proponents of A3371 have made assertions to the effect that there exists no empirical evidence that providing any type of therapy in childhood can alter adult same-sex orientation. This is irrelevant and not true. A treatment consisting solely of verbal counseling cannot be outlawed because there is no evidence that it is effective.

I declare under penalty of perjury of the laws of the United States and New Jersey that the foregoing statements are true and correct.

Executed this _____ day of August, 2013

                                                                    _____
                                                                    Joseph Nicolosi, Ph.D.