# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON DIVISION

|  |  |
|---|---|
| **TARA KING, ED.D**, individually and on behalf of her patients, **RONALD NEWMAN, PH.D.**, individually and on behalf of his patients, **NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY (NARTH), AMERICAN ASSOCIATION OF CHRISTIAN COUNSELORS (AACC),** | |
| Plaintiffs, | |
| v. | Case No. 13-cv-5308 |
| **CHRISTOPHER J. CHRISTIE**, Governor of the State of New Jersey, in his official capacity, **ERIC T. KANEFSKY**, Director of the New Jersey Department of Law and Public Safety: Division of Consumer Affairs, in his official capacity, **MILAGROS COLLAZO**, Executive Director of the New Jersey Board of Marriage and Family Therapy Examiners, in her official capacity, **J. MICHAEL WALKER**, Executive Director of the New Jersey Board of Psychological Examiners, in his official capacity; **PAUL JORDAN**, President of the New Jersey State Board of Medical Examiners, in his official capacity, | |
| Defendants. | |

## REBUTTAL DECLARATION OF DR. CHRISTOPHER ROSIK

I, Dr. Christopher Rosik, hereby declare as follows:

1.      I am over the age of 18 and am one of the Plaintiffs in this action. The statements in this Declaration are true and correct and if called upon to testify to them I would and could do so competently.

2.      I am submitting this Declaration in rebuttal to the Declarations submitted by the State of New Jersey when filing their Memorandum in opposition to Plaintiffs Motion for a Summary Judgment.

3.      I am a Phi Beta Kappa graduate of the University of Oregon's honors college and graduated with a Bachelor of Arts in Psychology in 1980. I also studied one semester at the University of Copenhagen, Denmark while completing my undergraduate work. I received my Master of Arts degree in Theological Studies from the Fuller Graduate School of Psychology, Fuller Theological Seminary in 1984. I received a Doctor of Philosophy degree in Clinical Psychology from the Fuller Graduate School of Psychology, Fuller Theological Seminary in 1986. I am a clinical psychologist licensed by the State of California and have been so licensed since 1988.

4.      My practice is located at the Link Care Center, which is a religious non-profit foundation in Fresno, California. Link Care Center employs a staff of twelve clinicians, which include psychologists, marriage and family therapists, a social worker, and an intern, and it employs two pastoral counselors. The majority of Link Care Center's clients come to the facility because of its Christian identity and their trust that their Christian values and beliefs will be represented in treatment. I served as the Clinical Director for Link Care Center Counseling Center from 1996-1999.

5.      Since 2001, I have also been on the clinical faculty of Fresno Pacific University, and I teach psychology research practicum every year. I have published over 40 articles and book

chapters in peer reviewed journals, many of them on the subject of homosexuality. I am a member of the American Psychological Association and have been a member in good standing since 1984; a member of the International Society for the Study of Trauma and Dissociation and have been a member in good standing since 1992; and member and former-president and board member of the Christian Association of Psychological Studies, Western Region; and am the current President of the National Association for Research and Therapy of Homosexuality.

## INTRODUCTION

*"To the extent that social scientists operate under one set of assumptions and values, and fail to recognize important alternatives, their scientific conclusions and social-policy recommendations are likely to be tainted"*
(Chambers, Schlenker, & Collisson, 2012, p. 148)

6.      I begin this rebuttal declaration where I concluded my prior declaration, noting that the mental health professions lack diverse viewpoints as pertains to sexual orientation and this limitation has deleterious consequences for research and policy development in this area, most immediately as concerns SOCE. In a profession where the ratio of liberals to conservatives in psychology is between 10 and 20 to 1 (Redding, 2012), such concerns cannot be dismissed out of hand. In what follows I hope to demonstrate what I believe to be further evidence of this problem in the declarations submitted by the State's expert witnesses. It should be noted that much of what is presented in these documents has already been addressed in my earlier declaration, so I will not repeat this in great detail again here but instead encourage the Court to carefully review what already is in the record.

### Further Symptoms of Advocacy and Activism Taking Precedence over Science
### Different Evidentiary Standards for Evaluating SOCE Efficacy and Harm

7.      One risk that arises when any profession lacks ideological diversity in its treatment of a particular subject matter is that of confirmation bias; that is, there is a tendency for partisans to differentially emphasize relevant literature, **often touting studies that support desired advocacy aims and disparaging studies that may counter such aims, even when these studies are equally subject to criticism**. I have documented in my earlier declaration that the APA report (2009) provides many

examples of this problem, wherein the Task Force's standards for methodological rigor are much lower in evaluating studies whose outcomes they preferred (alleging SOCE harms) than studies whose outcomes they disliked (alleging SOCE efficacy). The State's experts continued this unfortunate trend.

8.      Herek, for example, recounts the litany of methodological limitations that may exist in varying degrees among studies supportive of SOCE (Herek Decl., paragraph 32), and suggests that SOCE must be evaluated by only the most rigorous experimentally designed research (Herek Decl., paragraphs 30 and 31). Through this unreasonably high standard for identifying scientific value (though not certainty) in the SOCE-supportive literature, Herek can simply dismiss it, as the Task Force before him similarly did. Yet later in his declaration, **when Herek comes to the evidence for alleged harm, he displays a much lower threshold for scientific relevance**: "Although these data derive from **questionnaire studies**, clinical case studies, **anecdotal reports rather than controlled experiments**, they are important because they raise serious questions about whether SOCE may be harmful to many who undergo it" (Herek, paragraph 40, line 4-7) (emphasis added). Similarly, Drescher affirms the value of **anecdotal accounts** for assessing harms (paragraph 12, line 9), but then eschews the value of anecdotal claims of efficacy (paragraph 15, lines 13-14). These contrasts are striking, and they should not be lost to the Court as it considers the scientific arguments offered in favor of A3371. As I noted in my prior declaration, were the Task Force and experts such as Herek to use the equivalent evidentiary standards for efficacy that they do for harm, they would have to acknowledge the scientific merit of many studies of comparable or better quality as well as numerous anecdotal accounts supportive of the value of SOCE for some individuals.

9.      It bears mentioning in this context that California State Senator Ted Lieu, who sponsored the law in California which formed the template from which A3371 was developed, confessed in a moment of candor about the law: "*The attack on parental rights is exactly the whole point of the bill because we don't want to let parents harm their children. For example, the government will not allow parents to let their kids smoke cigarettes. We also won't have parents let their children consume alcohol at a bar or restaurant.*" (*Orange County Register*, August 2, 2012)

10.     In order to evaluate the scientific merit of Senator Lieu's equating the harms from SOCE with minors to those of cigarettes and alcohol, I conducted a search of the PsycARTICLES and MEDLINE databases. PsycARTICLES is a definitive source of full text, peer-reviewed scholarly and scientific articles in psychology, including the nearly 80 journals published by the American Psychological Association.   MEDLINE provides authoritative medical information on medicine, nursing, and other related fields covering more than 1,470 journals. I searched all abstracts from these databases using combinations of key words best suited to identify studies related to the question of interest.  Below are the totals for articles on cigarettes and alcohol (words preceding an asterisk indicate that the search included all words with that stem, so that a search for "minor*" would include both "minor" and "minors").

| Key Words | Total Articles | Earliest Article |
|---|---|---|
| Children & Alcohol | 4465 | 1917 |
| Children & Cigarettes | 883 | 1970 |
| Adolescent* & Alcohol | 6180 | 1917 |
| Adolescent* & Cigarettes | 1252 | 1971 |
| Minor* & Alcohol | 2670 | 1944 |
| Minor* & Cigarettes | 356 | 1973 |

11.     These totals make clear that the literature regarding youth as related to alcohol and cigarettes is extensive, with studies numbering in the thousands.  With such a sizeable database, one could reasonably expect that observations relative to the harms of cigarettes and alcohol among youth reflect reliable scientific information that has been replicated in numerous ways. These results, then, form the standard by which we can evaluate the volume of scientific literature from which any claims about SOCE and youth are based.

12.     Since SOCE is a relatively new term in the literature, I also conducted searches utilizing the terms "reparative therapy," "conversion therapy," and "sexual reorientation therapy," which were in use long before SOCE was coined.  My extensive search of the databases to identify scientific literature supportive of Sen. Lieu's comparison yielded the following findings:

| Key Words | Total Articles | Earliest Article |
|---|---|---|
| Children & Sexual Orientation Change Efforts | 0 | --- |
| Children & Reparative Therapy | 0 | --- |
| Children & Conversion Therapy | 0 | --- |
| Children & Sexual Reorientation Therapy | 0 | --- |
| Adolescent* & Sexual Orientation Change Efforts | 0 | --- |
| Adolescent* & Reparative Therapy | 1 | 2010 |
| Adolescent* & Conversion Therapy | 0 | --- |
| Adolescent* & Sexual Reorientation Therapy | 0 | --- |
| Minor* & Sexual Orientation Change Efforts | 0 | --- |
| Minor* & Reparative Therapy | 0 | --- |
| Minor* & Conversion Therapy | 0 | --- |
| Minor* & Sexual Reorientation Therapy | 0 | --- |
| Sexual Orientation Change Efforts & Harm | 0 | --- |
| Reparative Therapy & Harm | 1 | 2010 |
| Conversion Therapy & Harm | 1 | 2002 |
| Sexual Reorientation Therapy & Harm | 0 | --- |
| Homosexual* & Psychotherapy & Harm | 1 | 1977 |
| Gay & Psychotherapy & Harm | 1 | 1996 |
| Lesbian & Psychotherapy & Harm | 0 | --- |
| Bisexual & Psychotherapy & Harm | 0 | --- |

13.     In stark contrast to the thousands of articles related to alcohol and cigarette usage by youth, my search of the scientific literature for references that would back up Sen. Lieu's claims **yielded a total of four articles**. Interestingly, three of these articles were not research-oriented. Hein and Matthews (2010) discussed the potential harms of reparative therapy for adolescents but cited no direct research on SOCE with adolescents to support their concerns. They relied instead primarily on adult anecdotal accounts and did not distinguish between the provision of SOCE by licensed clinicians and unlicensed religious practitioners. Jones (1996) described a case of self-harm by a young gay man in response to "profound" and "thematic" relationship difficulties. The author reported that psychodynamic therapy was beneficial in helping the patient deal with relational conflict without making any mention of internalized homophobia or stigmatization.

14.     Hochberg (1977) discussed her treatment of a suicidal adolescent male who finally disclosed his homosexual experience as termination neared.  After this disclosure, Hochberg reported that, "Therapy subsequently exposed long-standing inhibitions in masculine assertiveness, longing for a love object that would increase his masculinity, (and allay his homosexual anxiety) and intense fear of physical harm" (p. 428). This article, then, would in some respects appear to provide anecdotal support *for* SOCE, not surprisingly coming in an era before reports of harm gained favored status over reports of benefit within the psychological disciplines.

15.     The only article my database search identified that could be considered quantitative research was Shidlo and Schroeder's (2002) well-known study on reported harms from SOCE.  As I noted in my prior declaration, the Shidlo and Schroeder study suffered from many methodological limitations, including **recruiting specifically for participants who had felt harmed by their SOCE** (Exhibit A), obtaining recollections of harm that occurred decades prior to the study, and not distinguishing between SOCE provided by licensed mental health professionals and unlicensed religious counselors. **As the authors correctly acknowledged, the findings of this study cannot be generalized beyond their specific sample of consumers**. This research can therefore tell us nothing about the prevalence of harm from SOCE provided by licensed therapists.

16.     Anyone with access to these databases can easily confirm the overwhelming trend of my investigation. I have to conclude from my results that Sen. Lieu's comparison lacks merit scientifically and therefore legal prohibitions on SOCE on the basis of harms to minors lacks a clear scientific justification.  This is, of course, consistent with the APA's Task Force's own claims, "Thus, we cannot conclude how likely it is that harm will occur from SOCE" (APA, 2009, p. 42). Nevertheless, the case against SOCE with minors is typically based on four sets of data: anecdotal accounts of harm (mostly from adults), a very few quantitative studies (compilations of anecdotal accounts from adults with severe methodological limitations), inferences from other research domains of questionable relatedness to SOCE (e.g., harms from family rejection of gay youth), and citations of the pronouncements on SOCE from professional mental health and medical associations.  These various sources tend to cite one another in an

almost symbiotic manner that provides little if any new information relevant to answering important questions about SOCE. I would again ask the court to seriously consider whether A3371's sweeping restrictions on parental freedom and professional practice can be justified on the basis of such minimal and anecdotal accounts of harm.

## Portraying Opponents in the Worst Possible Light

17.     Another hallmark of partisanship and activism is the attempt to demonize those whom you oppose. The characterization of SOCE providers by Drescher clearly falls into this category. Despite not practicing SOCE, Drescher claims to have intimate knowledge about what "typical" licensed SOCE providers believe and say to their clients (e.g., paragraphs 19, 20, and 24). Statements such as, "if you are gay, you will probably die early and live an unhappy and unhealthy life," and, "God will not love you if you are gay," **are unrecognizable to me as a professional who would be willing to assist an adolescent to explore the degree to which change in unwanted same-sex attractions and behavior might be possible for him or her**. Furthermore, licensed SOCE providers should be judged by their own practice guidelines (NARTH, 2010) and not the characterizations offered by those who oppose them. In my experience, such statements are far more likely to be made by unlicensed and unregulated religious counselors, who are not covered under A3371 and to whom (incredibly) licensed therapists are encouraged by the law's proponents to refer minor clients seeking SOCE. In a similar vein, Haldeman portrays licensed SOCE providers as stifling any accurate and honest explorations about their pursuit of SOCE, presupposing unrealistic outcomes, and imposing their beliefs upon minor clients regardless of the clients' own thoughts, desires, or personal explorations (Haldeman Decl., paragraphs 22 and 23).

18.     Given these portrayals of my clinical demeanor, it may surprise the Court to know that the majority of minors who I have assessed for SOCE I deemed not to be candidates for such an approach. In these cases, I instead worked with parents to encourage and educate them on the importance of continuing to love their child and keep the lines of communication open. In contrast to the approach of Drescher and Haldeman, I prefer to assume that they do excellent therapeutic work with those minor clients whose parents may seek them out for psychological care, thus their portrayal of egregious unprofessional

practice as normative among licensed SOCE providers is perplexing and disappointing for scholars of their stature.

19.     Similarly, it is hard to understand Herek's mention of the physical assaults, property crimes, violence, and bullying suffered by sexual minorities (Herek, Decl. paragraph 18) as having anything to do with professionally conducted SOCE, although it would make sense as part of an overall effort to prejudice the Court against SOCE. **I am unaware of any licensed SOCE providers who would not condemn such actions, not to mention many other forms of discrimination and harassment against gay and lesbian persons**.

20.     Additionally, as I noted in my prior declaration, **the frequent use by State's experts of terms such as "cure" to describe the goals of SOCE similarly employ medical language to portray these clinicians in a manner that would be foreign to the vast majority of them** (c.f., NARTH, 2010). This is perhaps a milder form of the straw argument, but no doubt is effective in creating negative impressions. Again, for the typical licensed SOCE provider change in unwanted same-sex attractions and behavior is typically understood to occur on a continuum of change, with change not occurring for some, categorical change being relatively rare, and many more clients (perhaps disproportionately bisexual and "mostly heterosexual" ones) achieving change in one or more dimensions of sexual orientation that is satisfying and meaningful to them.

### Failing to Provide Sufficient Context

21.     The omission of important contextual considerations in order to portray one's arguments in a more favorable light is another common symptom of advocacy and activism distorting the scientific record. While the **Defendants' experts attempt to establish widespread harms due to SOCE while acknowledging there is no current data to scientifically establish prevalence rates of harm,** they continually fail to put their concerns with SOCE in the broader context of the psychotherapy outcome research. Herek, for example, avoids discussion of the lack of harm prevalence data by alluding to definitions of what may constitute safe and effective psychological intervention (Herek Decl., paragraph 27).

22.     For the court to appropriately consider Herek's concerns, it needs to remember, as I mentioned in my earlier declaration, extensive research has shown that 5-10% of adult clients across all forms of psychotherapy are worse after treatment and that higher deterioration rates—sometimes exceeding 20%-- have been reported for children and adolescents in psychotherapy (Lambert, 2013; Lambert & Ogles, 2004; Nelson, Warren, Gleave, & Burlingame, 2013; Warren, Nelson, Burlingame, & Mondragon, 2012). In addition, **40-60% of youth drop out of all forms of psychological treatment early** (Kazdin, 1996; Nelson, et al. 2013; Wierzbicki & Perkarik, 1993). This has considerable implications for contextualizing the alleged reports of harm and efficacy from SOCE.  **Deterioration rates significantly beyond 20% would need to be established for professionally conducted SOCE in order for claims of approach-specific harms among youth to be substantiated**.  Otherwise, A3371 proponents are simply targeting one approach to psychological care on ideological and not scientific grounds.  Further, the high dropout rates among youth in all forms of psychotherapy add insight to the risk of premature termination in SOCE, wherein emotional distress arising from initial discussions of difficult issues may not be allowed sufficient therapeutic process to be adequately resolved.  This could result in a feeling of harm that would be attributable to the premature termination and not SOCE per se.

23.     Another example of failing to provide important context is found in Drescher's story about a man allegedly subjected to shock treatments as a part of SOCE within the past 10 years (Drescher Decl., paragraph 18, lines 3-5).  First, it is tempting for anyone involved in the political process surrounding contentious social issues to elevate a single experience to that of an exemplar if it suits their advocacy objectives. Drescher seems to have selected this story to contest the statement by plaintiffs that contemporary SOCE is only talk therapy and no longer utilizes such outdated practices.  However, important context is missing.  For instance, was the SOCE provider a licensed practitioner who would fall under the jurisdiction of a law such as A3371?  When was the client in question actually subjected to shock treatment?  Was this man a minor when he allegedly received this treatment?

24.     More broadly, Defendants' experts and mental health associations repeatedly associate electric shock, nausea inducing drugs, and other aversive interventions with SOCE, sometimes acknowledging

that these interventions have long been abandoned by the psychological professions (e.g., Haldeman Decl., paragraph 8).  **What they fail to report (Drescher is a welcomed exception here) is that such aversive interventions were quite accepted at the time within psychology and applied to a wide variety of clinical issues. Mentioning only SOCE in the context of past aversive techniques risks creating an inaccurate and prejudicial impression of SOCE interventions as historic outliers when this in fact is far from the truth**.

### The Problem of Self-Selection

25.    Dresher's story (paragraph 18) and Haldeman's report that, "My own experience as a mental health provider confirms the harms that SOCE therapies cause" (Haldeman Decl., paragraph 12, line 1-2) underscore another sign that scientific cautions may be losing out to advocacy.  It is common among the public, but should be much less so among professionals familiar with the scientific method, to generalize from one's own personal experience to the population in question as a whole. The problem here is that such a generalization is almost always unwarranted and can lead to highly inaccurate conclusions and stereotypes.

26.    I practice in an explicitly faith-based counseling center where a high percentage of clients present with deeply held traditional religious beliefs and values and have sought out clinicians who they believe are highly familiar with their faith community and can understand and affirm their religiously-based moral and value frameworks. I assume that State's experts practice in secular settings where such clients are much less likely to present for treatment. While there may be some overlap of client worldviews in our caseloads, the problematic reality is that many clients will have self-selected to pursue psychological care with a therapist who they believe sympathizes with their values and beliefs.

27.    This is a normal feature of client self-determination and one which is very likely exacerbated when the clinicians in question are high profile scholars who have written extensively about sexual orientation and SOCE.  **Defendants' experts are therefore far less likely to encounter positive accounts of SOCE and client reports of meaningful change, as satisfied SOCE clients have no reason to seek out gay-affirmative therapists**. This creates a serious risk of over generalizing negative

accounts of SOCE harms and failures.  To be sure, SOCE practitioners are subject to the same challenges in the inverse direction, but since the question before the court is the banning of SOCE for minors, the risk of over generalizing in a manner that unfairly and negatively characterizes professionally provided SOCE should be given particular notice.

### Client Autonomy and Self-Determination

28.     Haldeman in particular promotes the argument that SOCE can never advance client autonomy (Haldeman Decl., paragraphs 20-26). Setting aside the aforementioned observations that experts' portrayal of professional SOCE represents a caricature of SOCE practices, the lack of a sound scientific base from which to make judgments about SOCE efficacy and harm, and the high deteriorization and drop out rates among minors engaged in all forms of psychotherapy, Haldeman's argument is problematic for additional reasons.  For example, **he contends that SOCE presupposes a preferred outcome. Yet whether this is true or not in any particular case is beside the point; the important question is whether this is a preferred goal of the client, arrived at through a volitional and informed evaluation process**.

29.     Even more alarmingly, Haldeman states, "Respecting client autonomy does not mean that clients with strong religious beliefs that include, for example, disapproval of homosexual behavior, should be permitted to elect to undergo SOCE" (paragraph 24, lines 1-3). **Surely this is a statement that in the context of A3371 can only be taken to mean the religious beliefs and values of minor clients and their parents, if disapproving of homosexual behavior, are to be summarily overridden by the State**. Haldeman concludes his declaration by asserting that "true self-determination is accomplished when the patient's false assumption are corrected" (paragraph 26, lines 6-7), which in the context of his argument must include clients' false religious assumptions about the moral status of homosexual behavior.  From my vantage point, **such religious reeducation is outside the scope of the psychological disciplines and is the far more dangerous precedent as regards a clinician's preferred outcome for the therapeutic encounter**.

30.      Herek takes a more nuanced position on this subject that nonetheless still flirts with a similar line of reasoning when he equates the acceptance of a non-affirming moral evaluation of homosexual behavior as implicit self-stigma, which is a back door manner of denying any possibility for client autonomy and self-determination in SOCE. While I concur with Herek that the influence of external pressures and social norms should be carefully evaluated among clients presenting for SOCE, I reject the assertion that the pursuit of SOCE is by definition such self-stigma. This can only be the case if sexual orientation identities are to be universally prioritized over religious identities when sexual attractions and religious values conflict, which could conceivably constitute a form of religious discrimination.

31.      A related concern is with Defendants' experts' repeated claim that only bona fide psychiatric disorders constitute grounds for psychotherapeutic intervention (e.g., Haldeman Decl., paragraph 8; Davies Decl., paragraph 4). I repeat again what I noted in my earlier declaration: **many conditions that are not considered mental disorders are fully accepted as legitimate foci of psychological care**. These include relationship difficulties, bereavement, and unwanted pregnancy to name just a few.  In my experience, **it is far more common that clients who pursue SOCE first and foremost perceive their same-sex attractions as a religious and/or moral problem and only rarely as a mental disorder**. This once again seems to indicate that prohibiting the provision of SOCE to these minors and their parents can be considered a form of religious discrimination that does not respect their autonomy and self-determination in choosing their preferred form of psychological care.

32.      Finally, I again invite the Court to consider the reasonableness of A3371's explicit protection of the rights of minors to surgically alter genitalia if they experience themselves as being the wrong biological sex while simultaneously prohibiting minors who experience unwanted same-sex attractions and behaviors from even talking about their potential modification should it could be construed as SOCE. **Given that the prevalence of patient regret following sexual reassignment surgery (SRS) is estimated to be 10% to 30% and the finding that long-term outcomes of SRS do not remedy high rates of psychiatric morbidity and mortality (Olsson & Moller, 2006; Dhejne et al., 2011), it is**

difficult to understand apart from ideological partisanship how anyone can maintain client autonomy and self-determination among minors is served by promoting SRS but banning SOCE.

### Sexual Orientation, Sexual Abuse and SOCE

33.     Finally, it is important to address the critique offered by Davies in her declaration, as she appears to be the Defendants' only expert to directly address my initial declaration. **I begin by observing that Davies appears to have misread my statement and therefore attempts to refute a claim I did not make**. Specifically, I refer back to my statement that these studies provide "empirical evidence *consistent* with the theory that *familial or traumatic factors* potentially contribute to the development of sexual orientation" (emphases added) (Rosik Decl., paragraph 18, lines 3-4; Davies Decl., paragraph 6, lines 3-4). **Despite Davies' repeated insinuation otherwise, my use of the term "consistent" was purposeful and reflects a basic tenet of research interpretation, i.e., that correlation does not prove causation**. Thus, while these studies are of high caliber and consistent with such a relationship, I acknowledge they do not prove that such factors definitively cause sexual orientation. This certainly respects the authors' cautions about over interpreting their findings. By the same token, however, Davies must concede that these studies cannot prove such factors are definitively not implicated. The difference is that while I conclude these associations should lead us to pursue better research of an important topic, Davies appears convinced these associations can never reflect a causative connection between family structure or traumatic experiences and same-sex attractions and behaviors. She thus appears more convinced than I that the studies actually do prove something they cannot, because in her view they prove there is no causative relationship between such factors and sexual orientation.

34.     My utilization of the terms "familial or traumatic factors" should make evident that I was not only speaking about childhood sexual abuse, a fact that Davies appears to have overlooked in her critique of this literature. For example, while Frances (2008) contends that his findings did not support two popular biological theories of sexual orientation, he did find that, "Growing up without a biological parent is positively associated with homosexuality" (p. 375). This is a family structure issue, not necessarily sexual abuse, and although causation cannot be definitively inferred from the findings, it certainly is a result

worthy of further and additional research rather than an ideologically inspired foreclosure on scientific inquiry.

35.     Regarding the Bearman and Brueckner (2002) study, **this research on teenage twins revealed no genetic influence on the development of sexual orientation and found support for the significance of two familial socialization factors: having an opposite-sex twin and having elder sisters**. As the authors' put it, **"…our results support the hypothesis that less gendered socialization in early childhood and preadolescence shapes subsequent same-sex romantic preferences**" (p. 1179). More specifically they state, "This study shows that for OS [opposite sex] twins, in the absence of strong gender socialization, the proportion of male adolescents with same-sex attractions is twice as high as observed in the populations as a whole" (p. 1200).

36.     I of course agree with Davies that some of the studies I noted did not assess directly for sexual abuse but rather were concerned with family and other idiosyncratic environmental factors, of which sexual trauma could conceivably be included.  While there is a degree of speculation here, it is not without a basis in the extant literature, as a large body of studies indicate that sexual and other traumatic events are more common in the childhood experience of sexual minorities in comparison to heterosexuals (Austin et al., 2008; Corliss, Cochran, & Mays, 2002; Lehavot, Molina, & Simoni, 2012; Stoddard, Dibble, & Fineman, 2009; Friedman et al., 2011; Steed & Templer, 2010; Tomeo, Templer, Anderson, & Kotler, 2001; Wells, Magnus, McGee, & Beautrais, 2011).  The key interpretive question has always been to what extent traumatic experience precedes or is antecedent to the development of same-sex attractions and behaviors.  As I noted, correlational studies cannot decide this question, although partisans on both ends of the political spectrum sometimes take dogmatic positions in line with their ideological sympathies. **When a mental health association, governmental agency, or mental health professional contends that science has proven sexual and other trauma cannot be implicated as a causative influence in the development of same-sex attractions and behaviors, they are simply misrepresenting what science can tell us from correlational studies**.  Such a conclusion is as erroneous as saying sexual orientation is always and only caused by sexual abuse.

37.     While there is uncertainty then on how best to interpret this literature, when researchers directly inquire as to how these individuals perceive the role of trauma such as sexual abuse in the development of their sexual feelings, the findings sometimes go against the conventional wisdom as represented by Davies.  Walker, Archer, and Davies, (2005) studied the effects of rape upon a non-clinical sample of men and reported one participant's story:

> Before the assault I was straight; however, since the assault I have begun to engage in voluntary homosexual activity. This causes me a great deal of distress as I feel I am not really homosexual but I cannot stop myself having sex with men. I feel as if having sex with men I am punishing myself for letting the assault happen in the first place (p. 76).

38.     Similarly, Fields, Malebranche, & Feist-Price (2008) qualitatively examined the experiences among black men who have sex with men and who reported childhood sexual abuse, typically prolonged and repetitive in nature and often involving older male relatives. The authors found that:

> Participants commonly described feelings of isolation, depression, withdrawal, and social anxiety as reactions to their CSA [childhood sexual abuse] experiences. Five of the 10 participants (50%) who reported CSA believed that their current same-sex sexual behavior was connected to the CSA they experienced. The remaining 5 did not attribute their current same-sex behavior to their CSA experiences." (p. 387).

39.     What would happen if one of these men who connected their CSA experience to their sexual orientation had sought psychotherapy as a 17-year old and wanted to explore the degree to which their same-sex behavior might diminish?  It appears the position of Davies and some of the professional associations would be to tell such a client that his understanding is faulty as sexual trauma cannot play a causative role in sexual orientation, same-sex attractions and same-sex behaviors. Or perhaps the response would be that what these men are describing is not fundamentally sexual orientation. Yet A3371 defines SOCE precisely in terms of attempts to change same-sex attractions and behaviors.  How could a therapist possibly make such a distinction with confidence given the clear language of the law?  Worse still, **the court must realize that it is not Defendants' experts or any professional association that will determine when a therapist has transgressed the prohibitions of A3371. It is the client who makes the decision to contact a regulatory board and file a complaint against a therapist.  Such a complaint, even when erroneous, can cost the therapist tens of thousands of dollars to contest. In**

this respect, A3371 will invite mischief against licensed therapists who provide SOCE in a **professional and ethical manner. Even therapists who do not engage in SOCE will have to think twice about their involvement in cases such as the one noted above, reassurances otherwise by the law's proponents not withstanding**.

40.     Since nearly all of the research on childhood abuse and sexual orientation is correlational and definitive statements regarding the causal direction therefore cannot be made, more sophisticated studies are needed for furthering our understanding.  The Roberts, Glymour, and Koenen study (2013) used methodology more suited to assessing causality, and this may be one reason it has been subject to such scrutiny, as Davies illustrates.  No studies exist that are immune from methodological criticism, especially when they involve findings that run counter prevailing theories. **This is part of the scientific process and is not necessarily reflective of a "fatal flaw."**  Bailey and Bailey (2013) have a different interpretation of the limitations of the study's methods for drawing conclusions, which Roberts et al. certainly knew about as one of the commentators served as a peer reviewer for the article. Bailey and Bailey's concerns therefore were known prior to the publication of the study, concerns which two other reviewers (since review panels generally come in threes) and the editor assigned to the paper apparently did not judge to be fatal.  Otherwise, the paper would never have been published in such a prestigious journal. Furthermore, to my knowledge no erratum or retraction has been issued for this article or any of the others I mentioned, something an editor would surely do if the methodological issues in question were indeed "fatal flaws."

41.     As is the case for most complex and controversial scientific questions, the best explanation probably lies somewhere between the extremes; that is, somewhere between the absolute propositions that minority sexual orientation is always the result of childhood trauma or that such trauma can never be a causative influence in its development. Such complexity was suggested by Roberts, Glymour, and Koenen (2103) as well as by Alanko et al.'s (2008) study that used sophisticated statistical procedures to study gender atypicality, adult psychiatric symptoms, and parental style. These authors reported that childhood gender nonconformity influenced the likelihood of abuse, which in turn influenced the

likelihood of gender nonconformity.  Gender nonconformity is highly related to the development of adult minority sexual orientation, so these findings that suggest bidirectional causation have clear relevance to discussions about sexual orientation and childhood trauma.

42.     The current standard within the mental health field is that sexual orientation is likely determined by multiple factors (including developmental and social ones) whose individual significance is weighted differently for different individuals (APA, 2008). **Because of this complexity, therapists must follow the lead of clients in understanding the relevance of childhood trauma to their experience of same-sex attractions and behaviors as well as their preferred therapeutic approach for addressing this understanding. An absolutist position on the causes of minority sexual orientation or the banning of SOCE for minors is not listening to them but rather telling them what they understand, how they should understand it, and what professional care they must pursue.**

43.     Davies also asserts that SOCE is not part of the accepted treatment protocol for victims of childhood sexual abuse (Davies Dkt, paragraphs 14-17). **I am not aware of any SOCE practitioners making such a claim that it is. And why should they?  Not all victims of childhood sexual abuse have unwanted same-sex attractions and behaviors.** In fact, what many licensed SOCE practitioners will indicate is that their focus is not fundamentally on same-sex attractions and behaviors, but rather on issues relating to trauma and one's sense of personal identity. **Published accounts are not uncommon wherein a focus on the therapeutic resolution of traumatic experience precipitates spontaneous changes in same-sex attractions and behaviors, sans any formal discussion of SOCE** (Cornine, 2013; Rosik, 2012). Will such psychological care be considered stealth SOCE and subject the therapist to the punitive power of the State under the provisions of AB 3371?  Again, since it is ultimately clients who will make this determination and file complaints under AB 3371, I do not see how the law's proponents can make authoritative assurances that this could not in fact happen.

44.     Finally, I have dealt earlier with the concerns about harm in SOCE cited by Davies and will not go over those arguments here other than to repeat that the scientific basis for these statements is lacking,

as noted in the APA (2009) Report: "We cannot conclude how likely it is that harm will occur from SOCE" (p. 42).

## Conclusion

*"Let no one presume that ideology does not influence science.  Within psychology today there are topics that are deemed politically incorrect and they are neither published nor funded"* (p. xiv)

*"Political diversity is so absent in mental health circles that most psychologists and social workers live in a bubble.  So seldom does anyone express ideological disagreement with colleagues that they believe all intelligent people think as they do."* (p. xvi)

-Former APA president Nicolas Cummings (2005)

45.     Impressive resumes and authoritative resolutions should not be a substitute for directly relevant research that has evolved through the interplay of diverse and competing theoretical perspectives.  This is especially the case for contested social issues in our society such as those surrounding sexual orientation, including the status of SOCE. I have attempted to provide the Court with multiple lines of evidence that I believe demonstrate beyond a reasonable doubt the insufficient basis for definitive scientific conclusions about SOCE harms and efficacy, bringing into serious question the legitimacy of A3371. This evidence includes:

- A clear lack of ideological diversity within the psychological field concerning contested social issues, most immediately as pertains to SOCE;

- A subsequent tendency to differentially evaluate equally good (or bad or minimal) data depending on its value for achieving the political aim of banning SOCE;

- A failure to research questions and entertain equally valid alternative interpretations of findings relevant to SOCE and of interest to conservative scholars;

- A tendency to engage in ad hominem caricatures that portray licensed SOCE providers in only the most negative of stereotypes;

- A tendency to frame issues pertaining to SOCE in a manner absent of critical contextual information;

- A tendency to prioritize sexual identity over a conservative religious identity as regards allowable goals and therapeutic approaches, leading to a restriction of client autonomy and self-determination and subsequent discrimination against traditional religious understandings of sexual morality;

- A tendency to generalize from one's limited personal experiences and assume they represent a complete (and in this case only negative) picture of SOCE.

46.     These tendencies are the unmistakable symptoms of advocacy and activism running far ahead of where the scientific record can reasonably take it. Rather than shortcut the process of scientific discovery and guidance regarding SOCE through legislative fiat, I continue to maintain that conducting further research is the only scientifically and ethically justified way forward. What is especially needed in the politically monolithic environment of psychology are researchers willing to conduct studies where findings may run contrary to the prevailing orthodoxy on SOCE. This is no easy task and will not be definitively achieved without the participation of SOCE opponents, who have yet to respond to an open invitation from SOCE proponents for collaborative research (Jones, Rosik, Williams, & Byrd, 2010). And despite a specific call for research on SOCE by the authors of the APA Report (2009), A3371 further worsens this situation by making impossible research on SOCE with minors in New Jersey.

47.     The need for bipartisan participation is primarily because in the absence of such a joint effort, scholars conducting this research will be subject to severely negative professional consequences should their findings appear to challenge the social and political advocacy goals of the professional association and activist groups. This was the case when Spitzer received a high volume of hate mail and anger directed at him (Spitzer, 2003a; Vonholdt, 2000) before and after the publication of his SOCE study (Spitzer, 2003b) and was more recently on display in the harassment, character assassination, misconduct investigations, and professional marginalization Regnerus has endured following publication of his research on same-sex parenting (Regnerus, 2012; Wood, 2013).

48.     This Court and Defendants' experts may be surprised to learn that I do not believe I can have the most complete understanding of SOCE without the participation of those who oppose this practice. However, unlike proponents of A3371, I also am convinced that they cannot have the most complete understanding of SOCE without the participation of the many licensed professionals I represent before this Court. Yet to date, such participation has not been seriously entertained. **Within this ideological restricted environment, A3371 represents the triumph of advocacy interests over science. This law**

seriously and without genuine scientific warrant infringes upon the rights and religious liberties of many minors and their parents to participate in their preferred therapeutic approach. And it prevents the rights of licensed therapists to exercise their professional judgment in providing SOCE. The stakes for professional and parental rights and religious liberties could not be higher, and I therefore ask this court to reject A3371.

I declare under penalty of perjury of the laws of the United States and New Jersey that the foregoing statements are true and accurate.


Executed this 19th day of September, 2013



Christopher Rosik

References

Alanko, K., Santitila, P., Sato, B., Jem, P., Johansson, A., et al. (2011). Testing causal models of the relationship between childhood gender atypical behavior and parent-child relationship. *British Journal of Developmental Psychology, 29*, 214-233. doi: 10.1348/2044-835X.002004

American Psychological Association (2008). *Answers to your questions for a better understanding of sexual orientation and homosexuality*. Washington, DC: Author Retrieved from www.apa.org/topics/sorientation.pdf

American Psychological Association. (2009). *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation*. Retrieved from http://www.apa.org/pi/lgbt/resources/therapeuticresponse.pdf

Austin, S. B., Jun, H., Jackson, B., Spiegelman, D., Rich-Edwards, J., Corliss, H. L., & Wright, R. J. (2008). Disparities in child abuse victimization in lesbian, bisexual, heterosexual women in the Nurses' Health Study II. *Journal of Women's Health, 17*, 597-606. doi: 10.1089/jwh.2007.0450

Bailey, D. H., & Bailey, J. M. (2013). Poor instrumentation lead to poor inferences: Comment on Roberts, Glymour, and Koenen (2013). *Archives of Sexual Behavior*. Advanced online publication. doi: 10.1007/s10508-013-0101-5

Bearman, P. S., & Bruckner, H. (2002). Opposite-sex twins and adolescent same-sex attraction. *American Journal of Sociology, 107*, 1179-1205.

Chambers, J. R., Schlenker, B. R., & Collisson, B. (2012). Ideology and prejudice: The role of value conflicts. *Psychological Science, 24*, 140-149. doi: 10.1177/0956797612447820

Comine, C. K. (2013). EMDR, sexual confusion, and God-image: A case study. *Journal of Psychology and Christianity, 32*, 83-89.

Corliss, H. I., Cochran, S. D., & Mays, V. M. (2002). Reports of parental maltreatment during childhood in a United States population-based survey of homosexual, bisexual, and heterosexual adults. *Child Abuse & Neglect, 26*, 1165-1178.

Cummings, N. A. (2005). Preface. In R. H. Wright & N. A. Cummings (Eds.), *Destructive Trends in Mental Health. The Well-Intentioned Path to Harm* (pp. xii-xx). New York: Rutledge

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE, 6*(2), 1-8. doi:10.1371/journal.pone.0016885

Fields, S. D., Malebranche, D., & Feist-Price, S. (2008). Childhood sexual abuse in black men who have sex with men: Results from three qualitative studies. *Cultural Diversity and Ethnic Minority Psychology, 14*, 385-390. doi: 10.1037/1099-9809.14.4.385

Francis, A. M. (2008). Family and sexual orientation: The family-demographic correlates of homosexuality in men and women. *Journal of Sex Research, 45*, 371-377. doi: 10.1080/00224490802398357

Friedman, M. S., Marshal, M. P., Guadamuz, T. E., Wei, C., Wong, C. F., Sacwyc, E. M., & Stall, R. (2011). A meta-analysis of disparities in childhood sexual abuse, parental physical abuse, and peer victimization among sexual minority and sexual nonminority individuals. *American Journal of Public Health, 101*, 1481-1494. doi: 10.2105/AJPH.2009.190009

Hein, L. C., & Matthews, A. K. (2010). Reparative therapy: The adolescent, the psych nurse, and the issues. *Journal of Child and Adolescent Psychiatric Nursing, 23*(1), 29-35. doi: 10.1111/j.1744-6171.2009.00214.x

Hochberg, R. (1977). Psychotherapy of a suicidal boy: Dynamics and interventions. *Psychotherapy: Theory, Research, and Practice, 14*(4), 428-433.

Jones, A. (1996). An equal struggle (psychodynamic assessment following repeated episodes of deliberate self-harm). *Journal of Psychiatric and Mental Health Nursing, 3*(3), 173-180.

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. *The General Psychologist, 45*(2), 7-18.  Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

Karzdin, A. E. (1996). Dropping out of child therapy: Issues for research and implications for practice. *Clinical Child Psychiatry and Psychiatry, 1*, 133-156. Retrieved from http://intl-ccp.sagepub.com/

Lambert, M. J. (2013). The efficacy and effectiveness of psychotherapy. In Michael J. Lambert (Ed.), *Bergin and Garfield's Handbook of Psychotherapy and Behavior Change* (6th Edition), (pp. 169-218). Hoboken, NJ: Wiley.

Lambert, M. J., & Ogles, B. M. (2004). *The efficacy and effectiveness of psychotherapy.* New York, NY: Wiley.

Lehavot, K., Molina, Y., & Simoni, J. M. (2012). Childhood trauma, adult sexual assault, and adult gender expression among lesbian and bisexual women. *Sex Roles, 67*, 272-284. doi: 10.1007/s11199-012-0171-1

National Association for Research and Therapy of Homosexuality (2010). Practice Guidelines for the Treatment of Unwanted Same-Sex Attractions and Behaviors. *Journal of Human Sexuality, 2*, 5-65.  Retrieved from http://www.scribd.com/doc/115506183/Journal-of-Human-Sexuality-Vol-2

Nelson, P.L., Warren, J.S., Gleave, R. L., & Burlingame, G. M. (2013). Youth psychotherapy change trajectories and early warning system accuracy in a managed care setting. *Journal of Clinical Psychology, 69*, 880-895. doi: 10.1002/jclp.21963

Olsson, S. & Moller, A. (2006). Regret after sex reassignment surgery in a male-to-female transsexual: A long-term follow-up. *Archives of Sexual Behavior, 35*, 501-506. doi: 10.1007/s10508-006-9040-8.

*Orange County Register* (August 2, 2012). Controversy follows effort to ban gay conversion therapy. Retrieved from http://www.ocregister.com/news/therapy-365822-parents-orientation.html

Redding, R. E. (2012). Likes attract: The sociopolitical groupthink of (social) psychologists. *Perspectives on Psychological Science, 7*, 512-515. doi: 10.1177/1745691612455206

Regnerus, M. (2012). How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study. *Social Science Research, 41*, 752-770.

Roberts, A. L., Glymour, M. M., & Koenen, K. C. (2013). Does maltreatment in childhood affect sexual orientation in adulthood? *Archives of Sexual Behavior, 42*, 161-171. doi: 10.1007/s10508-012-0021-9

Rosik, C. H. (2012). Opposite-gender identity states in Dissociative Identity Disorder: Psychodynamic insights into a subset of same-sex behavior and attractions. *Journal of Psychology and Christianity, 31*, 269-275.

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumers' report. *Professional Psychology: Research and Practice, 33*(3), 249-259.

Spitzer, R. L. (2003a). Reply: Study results should not be dismissed and justify further research on the efficacy of sexual reorientation therapy. *Archives of Sexual Behavior, 32*(5), 469-472. doi: 10.1023/A:1025651627919

Spitzer, R. L. (2003b). Can some gay men and lesbians change their sexual orientation? 200 participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior, 32*(5), 403-417. doi: 10.1037/t02175-000

Steed, J. J., & Templer, D. I. (2010). Gay men and lesbian women with molestation history: Impact on sexual orientation and experience of pleasure. *The Open Psychological Journal, 3*, 36-41. doi: 10.2174/1874350101003010036

Stoddard, J. P., Dibble, S. I., & Fineman, N. (2009). Sexual and physical abuse: A comparison between lesbians and their heterosexual sisters. *Journal of Homosexuality, 56,* 407-420. doi: 10.1080/00918360902821395

Tomeo, M. E., Templer, D. I., Anderson, S., & Kotler, D. (2001). Comparative data of childhood and adolescent molestation in heterosexual and homosexual persons. *Archives of Sexual Behavior, 30*, 535-541.

Vonholdt, C. R. (2001). Interview with Robert L. Spitzer: Homosexuality and the reality of change. *Bulletin of the German Institute for Youth and Society*, 1, 33-36. Retrieved from http://www.dijg.de/english/homosexuality-reality-of-change/

Walker, J., Archer, J., & Davies, M. (2005). Effects of rape on men: A descriptive analysis. *Archives of Sexual Behavior, 14*, 69-80. doi: 10.1007/s10508-005-1001-0

Warren, J.S., Nelson, P. L., Burlingame, G. M., & Mondragon, S. A. (2012). Predicting patient deterioration in youth mental health services: Community mental health vs. managed care settings. *Journal of Clinical Psychology, 68*, 24-40. doi: 10:1002/jclp.20831

Wells, J. E., McGee, M. A., & Beautrais, A. L. (2011). Multiple aspects of sexual orientation: Prevalence and sociodemographic correlates in a New Zealand National Survey. *Archives of Sexual Behavior, 40,* 155-168. doi: 10.1007/s10508-010-9636-x

Wierzbicki, M., & Pekarik, G. (1993). A meta-analysis of psychotherapy dropout. *Professional Psychology: Research and Practice, 24*, 190-195. doi: 10.1037/0735-7028.24.2.190

Wood, P. (2013). The campaign to discredit Regnerus and the assault on peer review. *Academic Questions, 26*, 171-181. doi: 10.1007/s12129-013-9364-5

# EXHIBIT A

# HELP US DOCUMENT THE DAMAGE OF HOMOPHOBIC THERAPIES

In association with the National Lesbian and Gay Health Association, we are conducting research on the outcome of treatments that claim to "cure" homosexuality. Our purpose is to document the damage that we believe occurs when a lesbian, gay or bisexual client receives psychological help from a provider who promises to change a person's sexual orientation.

We are looking for individuals who have experienced such a program and who are willing to talk about it confidentially by telephone, email or by filling out a written survey.

For more information, please contact Dr. Michael Schroeder and Dr. Ariel Shidlo telephone (212) 353-2558, email gayconvert@aol.com

IN THE FAMILY April 1996 page 27