**\*FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

The Honorable Freda L. Wolfson, U.S.D.J.

|  |  |
|---|---|
| TARA KING, ED.D., *et al.*, | Civil Action No. 13-5038 |
| Plaintiffs, | **OPINION** |
| vs. | |
| CHRISTOPHER CHRISTIE, Governor of New Jersey, *et al.*, | |
| Defendants. | |

Appearances:

*Counsel for Plaintiffs*

Demetrios K. Stratis, Esq.
Law Office of Demetrios K. Stratis, LLC
10-04 River Road
Fair Lawn, NJ 07410

*Counsel for Proposed Intervenor*

Andrew Bayer, Esq.
Gluck Walrath, LLP
428 Riverview Plaza
Trenton, NJ 08611

*Counsel for Defendants*

Susan Marie Scott, Esq.
Eric S. Pasternack, Esq.
Robert T. Lougy, Esq.
Office of the NJ Attorney General
R.J. Hughes Justice Complex
Po Box 112
Trenton, NJ 08625

On August 19, 2013, New Jersey Governor Christopher J. Christie signed into law Assembly Bill Number A3371 ("A3371") (codified at N.J.S.A. 45:1-54, -55),[1] which prohibits New Jersey state licensed practitioners, who provide professional counseling services, from treating minors using methods of Sexual Orientation Change Efforts ("SOCE"), more commonly known as "gay conversion therapy;" A3371 became effective on the same date. The Bill is the second piece of legislation of its kind in the nation, with California having been the first state to successfully enact such a law.[2] In passing this statute, the New Jersey Legislature determined, *inter alia*, that this type of treatment subjects minors to potentially harmful consequences. Challengers to the constitutionality of A3371 are Plaintiffs, Tara King Ed.D. and Ronald Newman, Ph.D., who are individual licensed therapists, as well as the National Association for Research and Therapy of Homosexuality ("NARTH") and the American Association of Christian Counselors ("AACC") (collectively, "Plaintiffs"), whose members include various

---

[1]     At the time Plaintiffs brought this suit, Assembly Bill A3371 had not been codified as a statute, and thus, the parties refer in their papers to the now-codified statute as A3371. In this Opinion, the Court will interchangeably use A3371 or N.J.S.A. 45:1-54. -55.

[2]     Challengers of the California statute were unsuccessful in overturning the law. The Ninth Circuit Court of Appeals, in *Pickup v. Brown*, 728 F.3d 1042 (9th Cir. 2013), recently held that California's statute banning licensed professionals from practicing SOCE is constitutional.

licensed professionals who practice or wish to engage in SOCE. [3]   The named defendants are Governor Christie, Eric T. Kanefsky, Director of the New Jersey Dep't of Law and Public Safety, Milagros Collazo, Executive Director of the New Jersey Board of Marriage and Family Therapy Examiners, J. Michael Walker, Executive Director of the New Jersey Board of Psychological Examiners, and Paul Jordan, President of the New Jersey State Board of Medical Examiners (collectively, "Defendants" or the "State").   Plaintiffs also bring constitutional claims on behalf of the licensed professionals' minor clients and the clients' parents.[4]   Presently before the Court are cross motions for summary judgment.[5]   During the pendency of the briefing, Proposed Intervenor, Garden State Equality ("Garden State"), moved to intervene as a defendant in this case, or in the alternative, it sought *amicus curiae* status.

On these motions, the parties raise a host of legal issues, the most significant of which focuses on whether, by prohibiting the practice of SOCE, the State has impermissibly infringed upon Plaintiffs' First Amendment rights -- freedom of speech and free religious expression.

---

[3]      There is no dispute that NARTH and AACC have associational standing to bring claims on behalf of their members.

[4]      Within the last week, a minor client and his parents, represented by the same counsel as represents Plaintiffs here, filed a similar lawsuit against Defendants challenging the constitutionality of A3371.  This matter also is assigned to me.  *See Doe v. Christie, et al.*, Civ. No. 13-6629(FLW).

[5]      Initially, Plaintiffs sought to preliminarily enjoin Defendants from enforcing A3371; however, during the pendency of that motion, the parties agreed to convert the preliminary injunction motion into one for summary judgment, with Defendants cross moving for summary judgment.

Because the Court finds that A3371 restricts neither speech nor religious expression, rational basis review applies.  I further find that A3371 passes constitutional muster under that standard.  Accordingly, Defendants' cross motion for summary judgment is **GRANTED** in its entirety; and Plaintiffs' motion for summary judgment is **DENIED**.  Garden State's motion to intervene is **GRANTED**.

## BACKGROUND

Assembly Bill A3371 precludes persons licensed to practice in certain counseling professions from engaging in "the practice of seeking to change a [minor's] sexual orientation."  § 2(b).  The statute has two sections; Section 1 provides legislative findings and declarations, while Section 2 defines SOCE and establishes the scope of the legislative prohibition on such conduct.

### *Section 1 (N.J.S.A. 45:1-54)*

In Section 1 of the Statute, the Legislature declared that "[b]eing lesbian, gay, or bisexual is not a disease, disorder, illness, deficiency, or shortcoming. The major professional associations of mental health practitioners and researchers in the United States have recognized this fact for nearly 40 years."  § 1(a).  The Legislature then went on to state that "[m]inors who experience family rejection based on their sexual orientation face especially serious health risks," and that "[s]uch directed efforts [at changing sexual orientation] are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes."  §§ 1(m), (j)(2).

4

In support of its determination, the Legislature cited many of the position statements and resolutions of professional associations, including, *inter alia*, the American Psychiatric Association, the American Academy of Pediatrics and the American Academy of Child and Adolescent Psychiatry.  § 1 (c)-(m).  According to the Legislature, each of these professional associations has concluded that there is little or no evidence of the efficacy of SOCE, and that SOCE has the potential for harm, such as causing those treated to experience depression, guilt, anxiety and thoughts of suicide.  *Id.*  Specifically, relying on the American Psychological Association's report on Appropriate Therapeutic Responses to Sexual Orientation, the Legislature found that "sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people, including confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, . . . [and] a feeling of being dehumanized." § 1(b).

Similarly, and particularly relevant to minors, citing an American Academy of Pediatrics journal article, the Legislature concluded that "[t]herapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation."  § 1(f).  The Legislature also looked to an American Academy of Child and Adolescent Psychiatry journal article, which states that

> [c]linicians should be aware that there is no evidence that
> sexual orientation can be altered through therapy, and that
> attempts to do so may be harmful . . . . Indeed, there is no
> medically valid basis for attempting to prevent
> homosexuality, which is not an illness.  On the contrary, such
> efforts may encourage family rejection and undermine self-
> esteem, connectedness and caring, important protective
> factors against suicidal ideation and attempts.  Given that
> there is no evidence that efforts to alter sexual orientation
> are effective, beneficial or necessary, and the possibility that
> they carry the risk of significant harm, such interventions are
> contraindicated.

§ 1(k).

Indeed, based on these professional associations' findings and other evidence before the Legislature, the State concluded that it "has a compelling interest in protecting the physical and psychological well-being of minors, including gays, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts." § 1(n).

### Section 2 (N.J.S.A. 45:1-55)

Assembly Bill A3371's prohibition on the practice of SOCE with a person under 18 years of age applies to "[a] person who is licensed to provide professional counseling under Title 45 of the Revised Statutes, including, but not limited to, a psychiatrist, licensed practicing psychologist, certified social worker, licensed clinical social worker, licensed social worker, licensed marriage and family therapist, certified psychoanalyst, or a person who performs counseling as part of the

person's professional training for any of these professions." § 2(a).[6] Further, the Legislature defines SOCE as "the practice of seeking to change a person's sexual orientation, including, but not limited to, efforts to change behaviors, gender identity, or gender expressions, or to reduce or eliminate sexual or romantic attractions or feelings toward a person of the same gender . . . ." § 2(b).

However, the statute makes clear that the prohibition does not include counseling for a person seeking to transition from one gender to another, or counseling that: (1) "provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful or unsafe sexual practices"; and (2) any other type of counseling that does not seek to change sexual orientation. *Id.* at (1), (2).

### *Plaintiff's Challenge to A3371*

Plaintiffs challenge the constitutionality of A3371 because they allege the statute violates their state and federal First Amendment rights, namely, freedom of speech and free exercise of religion. In addition, Plaintiffs, on behalf of minor clients and their parents, assert that A3371 interferes with the minor clients' right to self-determination and the parents' fundamental right to direct the upbringing of their children. As to free speech, Plaintiffs maintain that A3371 prohibits licensed professionals

---

[6]     It is important to note that A3371 does not prohibit non-licensed counselors or therapists, including non-licensed religious counselors, from practicing SOCE.

from engaging in, or referring to a licensed professional who engages in, counseling with a minor regarding his/her "unwanted" same-sex sexual attractions, placing an unconstitutional restraint on the content of Plaintiffs' message to their clients.  Plaintiffs reason that A3371 "authorizes only one viewpoint on SOCE and unwanted same-sex sexual attractions, behaviors, and identity by forcing . . . Plaintiffs . . . to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions . . . ." Compl., ¶ 186.

Plaintiffs further complain that A3371 infringes on their "sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel in order to honor their clients' right to self-determination and to freely exercise their own sincerely held religious beliefs to counsel on the subject matter of same-sex attractions . . . ." Compl., ¶ 235.   By doing so, Plaintiffs allege that A3371 "impermissibly burden[s] Plaintiffs' and their clients' sincerely held religious beliefs and compels them to both change those religious beliefs and to act in contradiction to them."  *Id.* at ¶ 237.  This type of restriction, Plaintiffs assert, violates their state and federal constitutional rights to the free exercise of religion.   Finally, Plaintiffs assert that A3371 violates the parents' fundamental rights "to direct the upbringing and education of their children according to their sincerely held religious beliefs," *Id.*, ¶ 260, because the statute "prevents the parents . . . from seeking mental health counseling for their minor children's unwanted same-sex attractions . . . ." *Id.* at ¶ 261.

Shortly after Plaintiffs filed suit, Garden State sought permissive intervention to defend the constitutionality of A3371. Founded in 2004, Garden State is a New Jersey civil rights organization, primarily advocating for lesbian, gay, bisexual, and transgender ("LGBT") equality within the state. It supports and lobbies for legislation, such as A3371, that prohibits, *inter alia*, discrimination on the basis of sexual orientation. Garden State aims to protect the interests of LGBT citizens in New Jersey, including youth. This organization has over 125,000 members, including LGBT minors and their parents, some of whom, according to Garden State, might be subject to SOCE treatment at the insistence of a parent or guardian, or based on the choice of a licensed mental health professional.

### *Procedural History*

Plaintiffs filed their six-count Complaint on August 22, 2013. Initially, Plaintiffs moved to temporarily restrain Defendants from enforcing A3371. However, after a telephone conference, and with the consent of the parties, the Court converted Plaintiffs' motion for a preliminary injunction to a summary judgment motion. Thereafter, Defendants cross-moved for summary judgment. After the filing of Plaintiffs' initial motion, Garden State moved to intervene as a defendant in this matter. By Text Order dated September 16, 2013, the Court granted Garden State's request, and indicated in that Order that the reasoning for the Court's decision would be stated more fully in a written opinion to follow.

On October 1, 2013, the Court held oral argument on these summary judgment motions, wherein counsel for Plaintiffs,[7] Defendants and the Intervenor participated.  Notably, during the hearing, Plaintiffs advanced an additional novel argument as to why Garden State should not be granted intervenor status: Garden State must have Article III standing to intervene at the district court level.  The Court reserved its decision on that question.  In addition, in response to the parties' various evidentiary objections to certain expert opinions/certifications, the Court indicated that all objections will be taken under advisement, and to the extent the Court relies on any certifications, the Court will rule on the relevant objections accordingly in this Opinion.    *See* Hearing Transcript ("Tr."), T58:12 – T59:11.

## DISCUSSION

### I.    Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed. R. Civ. 56(c); *Brooks v. Kyler,* 204 F.3d 102, 105 n.5 (3d Cir. 2000) (*citing* Fed. R. Civ. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d

---

[7]    During a teleconference, counsel for Plaintiffs indicated that they were objecting to Garden State's motion to intervene; however, counsel did not object to Garden State's alternative request to enter the litigation as *amicus*.

Cir. 1999) (citations omitted). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson,* 79 F.3d at 1366.

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* Fed. R. Civ. 56(c); *Anderson,* 477 U.S. at 249 (*citing First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n. 5 (*citing Anderson,* 477 U.S. at 249); *Big Apple BMW v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

## II. Motion to Intervene by Garden State

### A. Standing as an Intervenor

According to Plaintiffs, in their supplemental briefing, Garden State must independently satisfy Article III standing requirements before it can

11

be granted leave to intervene under Fed. R. Civ. P. 24(b). Generally, to demonstrate the "case or controversy" standing requirement under Article III, § 2 of the United States Constitution, a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir. 2000). Here, Plaintiffs argue that Garden State, a proposed intervening defendant, must also satisfy Article III's standing mandate.

To begin the analysis, I start with the Third Circuit's acknowledgement in *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311 (3d Cir. 2011), that neither the Third Circuit nor the Supreme Court "has determined whether a potential intervenor must even have Article III standing" to participate in district court proceedings. *Id.* at 318 n.4 (citing *Diamond v. Charles*, 476 U.S. 54, 68-69 (1986)).[8] While this circuit has not answered the standing question in the context of intervention, *Murray* recognized that other circuit courts are split on this issue. *Compare Ruiz*

---

[8]     Suggesting that the Third Circuit requires a proposed intervenor to satisfy standing, Plaintiffs rely on *Frempong v. Nat'l City Bank of In.*, 452 Fed. Appx. 167, 172 (3d Cir. 2011). Plaintiffs' reliance is inapt. *Frempong* dealt with a plaintiff husband -- not an intervenor -- who brought § 1983 claims in connection with defendant bank's foreclosure of his wife's property. The court found that plaintiff did not have standing to bring claims on his wife's behalf because he did not have any interest in the disputed property. In that context, the issue of whether a proposed intervenor must have independent standing under Article III was not addressed, let alone resolved – the question of intevenor status was not an issue.

*v. Estelle*, 161 F.3d 814, 830 (5th Cir. 1998) (holding that Article III standing is not a prerequisite to intervention); *City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1079 (5th Cir. 2009) (same); *Associated Builders & Contractors v. Perry*, 16 F.3d 688, 690 (6th Cir. 1994) (same); *Yniguez v. Arizona*, 939 F.2d 727, 731 (9th Cir. 1991) (same); *Sagebrush Rebellion, Inc., v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983) (same); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (same); and *United States Postal Serv. v. Brennan*, 579 F.2d 188, 190 (2d Cir. 1978) (same); *with Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996) (holding that Article III standing is necessary for intervention); *United States v. 36.96 Acres of Land*, 754 F.2d 855, 859 (7th Cir. 1985) (concluding that intervention under Rule 24 requires interest greater than that of standing); and *Rio Grande Pipeline Co. v. FERC, 178 F.3d 533*, 538 (D.D.C. 1999) (an "intervenor must have standing to participate as an intervenor rather than only as an amicus curiae.").[9]

Having reviewed the conflicting authorities cited above, I find that based on the circumstances of this case, Garden State need not satisfy standing requirements in order to intervene in these proceedings. [10]  I start

---

[9]    It bears noting that the recent Supreme Court decision in *Hollingworth v. Perry*, 133 S.Ct. 2652, 2661 (2013), did not directly address the issue of intervenor standing in general. Instead, in that case, the Court dealt with a narrower issue: the Court found that standing was lacking when an intervenor sought to appeal the judgment of the district court after the unsuccessful defendant government had decided not to pursue the lawsuit.

[10]    To the clear, an intervenor, by right or permission, normally has the right to appeal an adverse final judgment by a trial court, just as any other

with the "minority" view's reasoning. For example, the Eighth Circuit, in *Mausolf*, takes a rigid approach to intervention. The court there held that an intervenor, regardless of Rule 24 requirements, must have standing because "[a]n Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well." *Mausolf*, 85 F.3d at 1300. In that court's view, any intervenor that does not have independent standing, "destroys" an Article III case or controversy, regardless whether the original parties have standing to bring suit. *Id.*

On the other side of the coin, the "majority" view does not impose independent standing requirements on an intervenor at the district court level. "'[O]n many occasions the Supreme Court has noted that an intervenor may not have standing, but has not specifically resolved that issue, so long as another party to the litigation has sufficient standing to assert the claim at issue.'" *San Juan County, Utah v. United States*, 503 F.3d 1163, 1171-72 (10th Cir. 2007) (*en banc*) (quoting panel decision in *San Juan County, Utah v. United States*, 420 F.3d 1197, 1205 (10th Cir. 2005) (citing *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003)). These cases reason that Article III requires only that justiciable "cases" and "controversies" may be maintained in a federal court, *see*

---

party. *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-76 (1987). However, as any other party, an intervenor seeking to appeal on its own, must have standing under Article III of the Constitution to have the court decide the merits of the dispute. *Diamond*, 476 U.S. at 68. The standing requirement therefore may bar an appeal by an intervenor who nevertheless participated in the litigation before the district court. *United States v. Van*, 931 F.2d 384, 387 (6th Cir. 1991).

*Brennan*, 579 F.2d at 190, and, that a proposed intervenor is permitted to intervene on the basis of an existing party's standing to assert the claim at issue, based upon what the Supreme Court has described as "piggyback" standing. *See Diamond*, 476 U.S. at 64, 68-9.  Such standing is permissible because "[i]n that circumstance the federal court has a Case or Controversy before it regardless of the standing of the intervenor." *City of Colo.*, 587 F.3d at 1079.

The Eleventh Circuit has explained that the standing requirement exists to ensure that a justiciable case or controversy exists. *Chiles*, 865 F.2d at 1212-13, and, Rule 24, authorizing intervention, presumes that a justiciable case or controversy already exists before the court. *See Id.; see also*, 7C Wright, Miller, and Kane, Federal Practice and Procedure: Civil 2d § 1917 (2d ed. 1986) at 457 ("Intervention presupposes the pendency of an action in a court of competent jurisdiction . . . .") (footnote omitted). Because a court's subject matter jurisdiction is necessarily established before intervention, the *Chiles* court held that a party seeking to intervene need not have independent standing. *Id.* at 1212-13.

While the Third Circuit has not spoken on this matter and there are no cases on this issue in this district, there are at least three other district court opinions in this circuit that have found that an intervenor need not have independent standing to participate in district court proceedings. *See Indian River Recovery Co. v. The China*, 108 F.R.D. 383, 386-87 (D. Del. 1985) ("an intervenor need not have standing necessary to have initiated the lawsuit"); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v.*

*The Coca-Cola Co.*, 696 F. Supp. 57, 93 (D. Del. 1988) ("The fact that [a party] lack[s] standing, however, does not control the analysis of whether [it] [is] entitled to intervene."); *United States v. Germantown Settlement Homes, Inc.*, No. 84-2622, 1985 U.S. Dist. LEXIS 18193, at *6 n.1 (E.D. Pa. Jul. 5, 1985).

I find the reasoning of those courts that do not require independent standing by an intervenor to be persuasive. First, the constitutional requirement of standing only speaks to whether the federal district court has a justiciable controversy. In my view, so long there is a case or controversy before the court, it is not necessary that an intervenor have independent standing. Rather, Rule 24 aims to promote the efficient and orderly use of judicial resources by allowing persons to participate in the lawsuit to protect their interests or vindicate their rights. In that furtherance of the Rule, the court makes a determination whether those interests would be impaired by the disposition of the case. Imposing standing on an intervenor would eviscerate Rule 24's practical approach. And, furthermore, such a restriction would impinge on the purposes of permissive intervention. Accordingly, I find that Garden State need not separately satisfy standing requirements to intervene.

**B.     Permissive Intervention Pursuant to Rule 24(b)**

Garden State seeks to intervene on the basis of permissive intervention. Permissive intervention under Rule 24 requires (1) the motion to be timely; (2) an applicant's claim or defense and the main action have a question of law or fact in common; and (3) the intervention

16

may not cause undue delay or prejudice to the original parties' rights. *See* Fed. R. Civ. P. 24(b); *see also N.C.A.A. v. Governor of N.J.*, 520 Fed. Appx. 61, 63 (3d Cir. 2013); *Appleton v. Comm'r*, 430 Fed. Appx. 135, 137-38 (3d Cir. 2011). So long as these threshold requirements are met, whether to allow a party to permissively intervene is left to the sound discretion of the court. *See N.C.A.A.*, 520 Fed. Appx at 63.

As to the first factor, Garden State's motion is timely. Garden State moved to intervene only 14 days after the Complaint was filed. While Plaintiffs suggest that they did not have sufficient time to respond to Garden States' briefing, the Court has provided all parties an opportunity to respond to each other's arguments. There was more than sufficient time for Plaintiffs to address any arguments made by Garden State before the summary judgment hearing. And, indeed, the Court afforded Plaintiffs an opportunity to submit supplemental briefing on issues they deemed important after the hearing, including on the question of the proposed intervenor's standing.

Next, Plaintiffs contend that intervention is not necessary because Garden State's interests are already adequately represented by Defendants. However, the presence of overlapping interests between Garden State and the State does not preclude permissive intervention. Rather, "[t]he shared interests of [Garden State] and the state defendants support [Garden State's] argument that it shares a common question of law with the current action because it plans to defend the constitutionality of [A3371], the subject of the dispute between plaintiffs and the state

defendants." *Pickup v. Brown*, No. 12-2497, 2012 U.S. Dist. LEXIS 172027, at *13-14 (E.D. Cal. Dec. 4, 2012). Indeed, Plaintiffs have not disputed that Garden State's claims or defenses share common questions of law or fact with this action. Accordingly, I find that the second factor is satisfied.

Plaintiffs also contend that allowing Garden State to intervene would cause an undue delay of the resolution of Plaintiffs' claims because it would result in additional briefing by Plaintiffs. I do not find this argument convincing. As I have already explained, Garden State's filings in this matter would not unduly expand Plaintiffs' submissions because Garden State's arguments and positions are similar to those advanced by the State. In other words, while Plaintiffs may have expended additional time or expense in order to respond to Garden State's arguments, those efforts are not unduly prejudicial or burdensome. Rather, contrary to Plaintiffs' position, I find that Garden State has provided a "helpful, alternative viewpoint from the vantage of some persons who have undergone SOCE treatment or are potential patients of treatment that will aid the court in resolving plaintiffs' claims fully and fairly." *Id.* at *14.

Accordingly, having satisfied the Rule 24(b) factors, Garden State is given leave to intervene.

## III. Eleventh Amendment

In their Complaint, Plaintiffs bring parallel state constitutional claims against Defendants and they seek injunctive and declaratory relief, as well as nominal money damages. Defendants argue that the Eleventh

Amendment bars Plaintiffs' § 1983 claims for money damages and state constitutional claims.  During the hearing, Plaintiffs argued that they are entitled to nominal money damages in this action should they prevail. Since Plaintiffs did not brief their position on this issue, the Court provided Plaintiffs an opportunity to submit additional briefing.  Instead of any substantive response, Plaintiffs subsequently withdrew their claim for nominal damages.[11]  *See* Plaintiffs' Response on Claim for Nominal Damages, p. 2.  Moreover, Plaintiffs have also withdrawn their state constitutional claims.[12]  *See* Tr., T7:22-T8:2.

---

[11]     Indeed, it is clear that the Eleventh Amendment bars suits for damages, pursuant to 42 U.S.C. § 1983, against state officials sued in their official capacities.  The Eleventh Amendment provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is beyond cavil that the Eleventh Amendment protects states and their agencies and departments from suit in federal court.  *See Bayete v. Ricci*, 489 Fed. Appx. 540, 542 (3d Cir. 2012); *Hafer v. Melo*, 502 U.S. 21, 30 (1991).  Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities, *Id.*, and section 1983 does not override a state's Eleventh Amendment immunity.

[12]     Under the Eleventh Amendment, unlike federal claims seeking prospective injunctive relief, Plaintiffs may not bring state law claims – including state constitutional claims – against the State regardless the type of relief it seeks.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-06 (1984).  Likewise, supplemental jurisdiction does not authorize district courts to exercise jurisdiction over claims against non-consenting states.  There is no doubt that "the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court." *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540-41 (2002).

Accordingly, all federal claims for monetary damages -- however nominal -- against Defendants in their official capacities are barred, and Plaintiffs' state constitutional claims, i.e., Counts II and V, are dismissed.

## IV.   Third-Party Standing

As a jurisdictional matter, Defendants contend that Plaintiffs lack third-party standing to pursue claims on behalf of Plaintiffs' minor clients and parents. As discussed previously, to satisfy the "case or controversy" standing requirement under Article III, a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action.  Apart from those standing requirements, the Supreme Court has imposed a set of prudential limitations on the exercise of federal jurisdiction over third-party claims. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) ("The federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.") (quotation and citation omitted); *Powell v. Ridge*, 189 F.3d 387, 404 (3d Cir. 1999). The restrictions against third-party standing do not stem from the Article III "case or controversy" requirement, but rather from prudential concerns, *Amato v. Wilentz*, 952 F.2d 742, 748 (3d Cir. 1991), which prevent courts from "deciding questions of broad social import where no individual rights would be vindicated and . . . limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99-100 (1979); *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984).

It is important to bear in mind that in the jurisprudence of standing, a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994). This principle is based on the assumption that "third parties themselves usually will be the best proponents of their own rights," *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (plurality opinion), which serves to foster judicial restraint and ensure the clear presentation of issues. *See Munson*, 467 U.S. at 955.

The prohibition against third-party standing, however, is not absolute. The Supreme Court has found that the principles animating these prudential concerns are not subverted if the third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff. *See Craig v. Boren,* 429 U.S. 190, 193-94 (1976); *Singleton*, 428 U.S. at 114-15; *Eisenstadt v. Baird*, 405 U.S. 438, 443-46 (1972). Based on that recognition, third-party standing is permitted so long as the plaintiff can satisfy three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a "close relationship"; and 3) the third party must face some obstacles that prevent it from pursuing its own claims. *Powers*, 499 U.S. at 411; *Pitt News*, 215 F.3d at 362. It remains for courts to balance these factors to determine if third-party standing is warranted. *Amato*, 952 F.2d at 750.

21

Here, Plaintiffs assert constitutional claims on behalf of their minor clients and parents. To establish standing for these third parties, Plaintiffs must, in the first instance, show that they have suffered an injury. Indeed, Plaintiffs' ability to bring third-party claims hinges on whether they suffered any constitutional wrongs by the passage of A3371.[13] This question will be addressed extensively later in this Opinion, and, because the Court finds that Plaintiffs have suffered no injuries, they cannot meet the first factor. Furthermore, Plaintiffs cannot meet the third element of the test. Indeed, during the pendency of this matter, a minor and his parents filed suit in this Court, challenging the constitutionality of A3371. Therefore, since these litigants are bringing their own action against Defendants, there can be no serious argument that these third parties are facing obstacles that would prevent them from pursuing their own claims. Accordingly, I find that Plaintiffs do not meet third-party standing requirements, and thus, Counts III and VI are dismissed as well.

## V.  First Amendment—Freedom of Speech

Plaintiffs first challenge the constitutionality of A3371 on the ground that it violates their First Amendment right to free speech, contending that the statute constitutes an impermissible viewpoint and content-based restriction on their ability to discuss and engage in SOCE. Specifically, Plaintiffs argue that the statute forbids licensed counselors

---

[13]    Plaintiffs concede that their ability to bring third-party claims depends upon whether they have suffered any injuries as a result of the passage of A3371.  *See* T8:17-T917.

from both (1) speaking on or about the subject of SOCE to their minor clients, including recommending SOCE or referring a client to SOCE, and (2) administering SOCE to their minor clients under any circumstance, regardless of the client's informed consent to the practice.  Plaintiffs posit that because psychotherapy is carried out virtually exclusively through "talk therapy," any restriction on a therapist's ability to engage in a particular type of therapy is therefore a restriction on that therapist's First Amendment free speech right.  Thus, Plaintiffs argue, that as a regulation of speech, A3371 cannot survive the applicable standard of review, *i.e.*, strict scrutiny.

The State rejects Plaintiffs' interpretation of A3371, and, in particular, that the statute regulates, or implicates, speech in any form.  Rather, the State claims that the statute merely restricts a licensed professional from engaging in practicing SOCE counseling, and accordingly is a rational exercise of the State's long-recognized power to reasonably regulate the counseling professions.  In that connection, the State asserts that A3371 targets conduct only, not speech.  Accordingly, Defendants argue that the statute does not implicate any fundamental constitutional right and withstands rational basis review.

It is clear that the threshold issue before the Court is whether A3371 regulates constitutionally protected speech.  I first determine whether the statute on its face seeks to regulate speech; I then turn to whether the statute has the effect of burdening speech or expressive conduct.  Ultimately, if the statute does not implicate or burden constitutionally

protected speech or expression in any manner, I apply rational basis review.  If, however, the statute does seek to regulate speech or has the effect of burdening protected speech, directly or incidentally, I must determine the degree of constitutional protection afforded to, as well as the resulting burden on, that speech and then apply the appropriate standard of review.

I note that A3371 is a novel statute in New Jersey and other jurisdictions within the Third Circuit, as is the issue of whether counseling, by means of talk therapy, is entitled to any special constitutional protection.   However, I do not start with a blank slate.   Last year, California passed a law, SB 1172, that is virtually identical to A3371 in both language and purpose.  After two district court challenges, one finding SB 1172 constitutional, *Pickup v. Brown*, No. 12-02497, 2012 WL 6021465 (E.D. Cal., Dec. 4, 2012), the other not, *Welch v. Brown*, 907 F. Supp. 2d 1102 (E.D. Cal. 2012), a panel for the Ninth Circuit Court of Appeals concluded that the statute is constitutional.[14]  *See Pickup v. Brown*, 728 F.3d 1042 (9th Cir. 2013).  Although the *Pickup* decision is not binding on me, given the relevance of this opinion, and the dearth of decisions from the Third Circuit or other jurisdictions addressing the interplay between constitutionally protected speech and professional counseling, I will turn

---

[14]      Plaintiffs point out that the Ninth Circuit has directed the parties involved in the California statute litigation to brief whether *en banc* review of the panel's decision would be appropriate.   As of the date of this Opinion, however, no order for *en banc* review has issued.

to the Ninth Circuit's decision where appropriate, and explain my reason for so doing.

### A.    A3371 Does Not Regulate Speech

I begin by reviewing the plain language of A3371.  Even a cursory review reveals that the statute nowhere references speech or communication; instead, the statute contains words and phrases that are generally associated with conduct.  For example, the operative statutory language directs that a licensed counselor "shall not *engage in* sexual orientation change *efforts*," and further defines "'sexual orientation change efforts" as "the *practice* of seeking to change a person's sexual orientation."   N.J.S.A. 45:1-55 (emphasis added).   Such language is commonly understood to refer to conduct, and not speech, expression, or some other form of communication.  *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572-73 (1991) (Scalia, J., concurring) (noting that a criminal statute prohibiting a person from "engag[ing]," "appear[ing]", or "fondl[ing]" "is not directed at expression in particular"); *United States v. Tykarsky*, 446 F.3d 458, 473 (3d Cir. 2006) (facially reviewing statute with the operative words "engage in prostitution" and determining this term governed conduct); *cf. Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808, 814 n.8 (3d Cir. 1982) (finding that Pennsylvania statute regulating the bidding, distribution, screening, and exhibition of motion pictures to have "no facial impact upon speech"); *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1128 (N.D. Cal. 2002) (finding that portion of Copyright Act that "ban[ned] trafficking in devices,

whether software, hardware, or other" did not on its face target speech).

Moreover, the Ninth Circuit reached the same conclusion in *Pickup*, 728 F.3d 1042, finding that the statute did not implicate speech. Specifically, the *Pickup* panel determined that the California law did not do any of the following:

- Prevent mental health providers from communicating with the public about SOCE
- Prevent mental health providers from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic
- Prevent mental health providers from recommending SOCE to patients, whether children or adults
- Prevent mental health providers from administering SOCE to any person who is 18 years of age or older
- Prevent mental health providers from referring minors to unlicensed counselors, such as religious leaders
- Prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults
- Prevent minors from seeking SOCE from mental health providers in other states

*Id.* at 1049-50. I find that the *Pickup* panel's explanation of the reach of the California law applies with equal force to A3371, given the statutes' similarities. Nothing in the plain language of A3371 prevents licensed professionals from voicing their opinions on the appropriateness or efficacy of SOCE, either in public or private settings. Indeed, A3371 does not prevent a licensed professional from, for example, lecturing about SOCE at a conference or providing literature to a client on SOCE; the statute only prohibits a licensed professional from engaging in counseling for the purpose of actually practicing SOCE. In light of the foregoing—and Plaintiffs' failure to provide any substantive support to the contrary, other

than their own subjective interpretations—I find that A3371 does not directly regulate or target speech on its face.

In that regard, although Plaintiffs do not meaningfully advance an argument that A3371 regulates speech *per se*, Plaintiffs nevertheless contend that A3371 clearly targets speech by virtue of the statute's application solely to licensed *counselors*. According to Plaintiffs, SOCE counseling necessarily implicates speech because "SOCE counseling is talk therapy." *See* Decl. of Dr. Tara King, ¶ 12;[15] *see also* Pl. Reply, 8

---

[15] I pause briefly to note that, following oral argument in this matter, Plaintiffs filed a motion to "Reconsider Dispensing of Evidence and Deem Certain Facts Admitted." *See* Dkt. No. 50. The thrust of Plaintiffs' motion is twofold: (1) for the Court to reconsider its ruling that it would not consider evidence submitted in connection with Plaintiffs' summary judgment motion, and (2) to deem the facts in Plaintiffs' Complaint admitted by virtue of the State's failure to timely file an answer. Both of these arguments are without merit.

First, Plaintiffs are mistaken in their belief that I have made any ruling with respect to consideration of their supporting declarations and other evidence. At oral argument, in a colloquy with Plaintiffs' counsel, I made clear that I would consider declarations from the named Plaintiffs as "they are absolutely relevant." Tr., T59:25-T60:8. I explicitly stated that "I'm taking [Plaintiffs'] declarations," and that "[i]f I find something in there that shouldn't be considered, I'll make a note of it." *Id.* at T60:12-14. With respect to other declarations and evidence filed by Plaintiffs and Intervenor, I noted that there were volumes of submissions and objections, but that I was not making any rulings on the admissibility of the submitted evidence unless and until I determined that such evidence was necessary and appropriate to deciding the issues in this matter. *Id.* at T58:12-59:3. In that connection, I explained that the law was clear that if I were to find rational basis review applies to A3371, it would be unnecessary to consider evidence beyond the legislature's stated findings, and thus there is no reason to prematurely decide the admissibly of such evidence. *Id.* at T59:4-11. Accordingly, there is no basis for Plaintiffs' reconsideration motion, and Plaintiffs' motion is denied in that regard.

Second, Plaintiffs are not entitled to have certain facts in their Complaint be deemed admitted. Initially, Plaintiffs filed their Complaint accompanied by a motion for a preliminary injunction. Following a conversation with counsel for Plaintiffs and the State on August 27, 2013,

("Plaintiffs' counseling involves no nonspeech elements, and should be considered pure speech.").  Plaintiffs explain that:

> SOCE counseling consists of discussions with the client concerning the nature and cause of their unwanted same-sex sexual attractions, behaviors, or identity; the extent of these attractions, behaviors, or identity; assistance in understanding traditional, gender-appropriate behaviors and characteristics; and assistance in fostering and developing those gender-appropriate behaviors and characteristics.

Decl. of Dr. Joseph Nicolosi, ¶ 10.   Similarly, during oral argument, counsel for Plaintiffs stated that SOCE therapists "simply talk to [their clients] . . . about what their ultimate objectives are, and they would try to give them support to reach that objective, which in this case would be change." Tr., T18:18-23.  Plaintiffs further stress that they do not use any "aversion techniques"[16] with clients seeking to change their sexual

---

the parties agreed that (1) the Complaint presented a legal issue only, (2) Plaintiffs' motion should be treated as one for summary judgment, and (3) the State should be given the opportunity to file its own cross-motion for summary judgment.  *See* Dkt. No. 13.  Under the Federal Rules of Civil Procedure, the time in which a party must file a responsive pleading to a claim is tolled if that party elects to instead file a motion to dismiss.  *See* Fed. R. Civ. P. 12(a)(4).  In that connection, Rule 12 also permits a court to convert a motion to dismiss into one for summary judgment if evidence has been presented along with the motion.  In light of Rule 12, and given the atypical procedural developments in this matter, the State is not yet required to file an answer to the Complaint.  Accordingly, Plaintiffs' motion to deem admitted facts in the Complaint is denied.

[16]     As Plaintiff King explained in her declaration, "aversion techniques, such as electroshock treatments, pornographic viewing, nausea-inducing drugs, etc. are unethical methods of treatment that have not been used by any ethical and licensed mental health professional in decades."  Decl. of Dr. Tara King, ¶ 12; *see also Pickup*, 728 F.3d at 1048-49 ("In the past, aversive treatments included inducing nausea, vomiting, or paralysis; providing electric shocks; or having an individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts. Even more drastic methods, such as castration, have been used.").

orientation, and that they only engage in SOCE with clients who, following informed consent, voluntarily wish to receive such counseling.  *See, e.g.*, Decl. of Dr. Tara King, ¶¶ 10, 12-13; Decl. of Dr. Joseph Nicolosi, ¶¶ 7-8. In sum, Plaintiffs' position is that, regardless of whether A3371 facially appears to target conduct, the statute is directed at "counseling," and counseling, as relevant here, consists almost solely of talk therapy; thus, A3371 effects a constitutionally impermissible viewpoint and content based restriction on Plaintiffs' speech.  In contrast, the State maintains that counseling is conduct, subject to regulation by the state, and that A3371, by its own terms, only governs counseling; the statute does not prevent a licensed counselor from speaking about SOCE, but only prohibits the actual practice of counseling to change a minor's sexual orientation.

Plaintiffs' argument rests entirely on the premise that SOCE counseling, in the form of talk therapy, is "speech" in the constitutional sense.  Indeed, Plaintiffs, both in their papers and at argument, essentially treat this premise as self-evident, spending little time explaining why talk therapy is properly considered constitutionally protected speech rather than conduct.  I believe a more far-reaching analysis is required because, as explained in more detail *infra*, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

Accordingly, I must determine whether SOCE counseling should be considered (i) a form of speech, subject to constitutional protections, (ii) mere conduct, subject to reasonable regulation by the state, or (iii) some combination of both.

I begin with the statutory framework in which A3371 is found: Subtitle 1 of Title 45 of the New Jersey Statutes, governing "Professions And Occupations Regulated By State Boards Of Registration And Examination." N.J.S.A. 45:1-55.  Indeed, A3371 expressly provides that the statute only applies to: "A person who is licensed to provide professional counseling under Title 45 of the Revised Statutes, including, but not limited to, a psychiatrist, licensed practicing psychologist, certified social worker, licensed clinical social worker, licensed social worker, licensed marriage and family therapist, certified psychoanalyst . . . ." *Id.* Because the statute only governs "professional counseling" by these, or other similarly "licensed" individuals, I find it helpful to turn to the statutes defining the nature of these licensed practices to better understand the meaning of "counseling" as embodied in A3371.

Section 45:14B-2 of the New Jersey Statute covers psychologists and defines the "practice of psychology" as "the rendering of professional psychological services," which in turn are defined as "the application of psychological principles and procedures in the assessment, counseling or psychotherapy of individuals for the purposes of promoting the optimal development of their potential or ameliorating their personality disturbances and maladjustments as manifested in personal and

interpersonal situations." More simply put, this statute regulates licensed psychologists' "application of psychological principles and procedures" to their clients. Because the statute targets the application of principles and procedures, and not any speech, I view this as a regulation of treatment, *i.e.*, conduct. In that sense, counseling, as it arises in the context of psychology, is identified as one of the vehicles for psychological treatment, not a form of speech or expression. It would therefore appear that the means through which counseling is carried out by a psychologist—*i.e.*, whether through talk therapy or actions—is immaterial for the purposes of this statutory definition; the relevant inquiry is whether the psychologist is applying psychological principles and procedures. Similar conclusions can be drawn from other New Jersey statutes regulating the professions and occupations covered by A3371, as these statutes abound with references to counseling as the application of established sociological or psychological methods, principles, and procedures.[17]

---

[17]     *E.g.*, N.J. Stat. Ann. 45:8B-2(b) ("The practice of marriage and family therapy consists of the application of principles, methods and techniques of counseling and psychotherapy for the purpose of resolving psychological conflict, modifying perception and behavior, altering old attitudes and establishing new ones in the area of marriage and family life."); *id.* at 45:15BB-3 ("'Clinical social work' means the professional application of social work methods and values in the assessment and psychotherapeutic counseling of individuals, families, or groups. Clinical social work services shall include, but shall not be limited to: assessment; psychotherapy; client-centered advocacy; and consultation."); *id.* ("'Psychotherapeutic counseling' means the ongoing interaction between a social worker and an individual, family or group for the purpose of helping to resolve symptoms of mental disorder, psychosocial stress, relationship problems or difficulties in coping with the social environment, through the practice of psychotherapy."); *id.* ("'Social work counseling' means the professional application of social work methods and values in advising and

Beyond New Jersey's statutory scheme, commentators have also long discussed psychological counseling in a manner that suggests counseling is therapy, and thus a form of conduct. *See, e.g.*, Note, *Regulation of Psychological Counseling and Psychotherapy*, 51 Colum. L. Rev. 474, 495 n.2 (1951) ("'Counseling' is a form of psychological aid rendered by a psychologist to an individual for social-psychological adjustment problems." (citing Starke R. Hathaway, *Some Considerations Relative to Nondirective Counseling as Therapy*, 4 J. Clin. Psychology 226-27 (1948); W. C. Menninger, *The Relationship of Clinical Psychology and Psychiatry*, 5 Am. Psychologist 3, 9 (1950))).  Similarly, in discussing mental health treatment generally, commentators focus on describing the "services" and "procedures" provided.  *See, e.g.*, Stacey A. Tovino, *Conflicts of Interest in Medicine, Research, and Law: A Comparison*, 117 Penn. St. L. Rev. 1291, 1309 (2013) ("Treatment may be defined as 'the

---

providing guidance to individuals, families or groups for the purpose of enhancing, protecting or restoring the capacity for coping with the social environment, exclusive of the practice of psychotherapy."); *id.* at 45:2D-3 ("'Alcohol and drug counseling' means the professional application of alcohol and drug counseling methods which assist an individual or group to develop an understanding of alcohol and drug dependency problems, define goals, and plan action reflecting the individual's or group's interest, abilities and needs as affected by alcohol and drug dependency problems."); *cf. id.* at 45:9-5, (covering psychiatrists and defining "the practice of medicine and surgery" to "include the practice of any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition"); *id.* at 45:11-23(b) ("The practice of nursing as a registered professional nurse is defined as diagnosing and treating human responses to actual or potential physical and emotional health problems, through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed or otherwise legally authorized physician or dentist.").

provision, coordination, or management of health care and related services by one or more health care providers' to a particular individual. The definition of treatment is based on the concept of health care, which has been defined as care, services, and procedures related to the health of a particular individual.   Health care is frequently defined to include preventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care that is provided to a particular individual, as well as counseling, assessments, and procedures that relate to the physical or mental condition or functional status of a particular individual.  Activities are thus classified as treatment when they involve a health care service provided by a health care provider that is tailored to the specific preventive, diagnostic, therapeutic, or other health care needs of a particular individual.").   While such commentary certainly is not dispositive, it provides further support for the concept that counseling is more properly understood as a method of treatment, not speech, since the core characteristic of counseling is not that it may be carried out through talking, but rather that the counselor applies methods and procedures in a therapeutic manner.

Notably, by their own admission, Plaintiffs define SOCE counseling as being "no different than any other form of mental health counseling," involving "the traditional psychodynamic process of looking at root causes, childhood issues, developmental factors, and other things that cause a person to present with all types of physical, mental, emotional, or psychological issues that in turn cause them distress."  Decl. of Dr. Tara

King, ¶ 12.  Accordingly, I find that the mere fact that counseling may be carried out through talk therapy does not alter my finding that A3371 regulates conduct and not speech.

Additional support for this conclusion comes from the Ninth Circuit's decision in *Pickup*.[18]  At the core of *Pickup* is the holding that:

> Because SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, SOCE, we conclude that any effect it may have on free speech interests is merely incidental. Therefore, we hold that SB 1172 is subject to only rational basis review and must be upheld if it "bear[s] . . . a rational relationship to a legitimate state interest."

*Pickup*, 728 F.3d at 1056.  The *Pickup* panel further concluded that California had a rational basis for enacting SB 1172, and thus the statute was constitutional.

Plaintiffs dispute the relevancy and persuasiveness of *Pickup*, contending that the panel misapplied controlling Ninth Circuit and Supreme Court precedent when it concluded that SB 1172, a law regulating SOCE therapy, is not a regulation of speech, notwithstanding that, as here, therapy in California is carried out almost entirely through "talk therapy." Plaintiffs further argue that even if the *Pickup* panel properly concluded that a statute like A3371 regulates conduct with only an "incidental" impact on speech, the panel nevertheless erred when it applied rational

---

[18]      Although I have already noted that the *Pickup* case is not binding, it is significant in that it addresses California statute SB 1172, which is virtually identical to A3371, and appears to be the only Court of Appeals decision analyzing the relationship between conduct and speech in the psychotherapy context.  Indeed, both parties have devoted substantial argument to the *Pickup* panel's reasoning and its applicability to this case.

basis review rather than the more demanding *O'Brien* test in upholding the statute.  *See United States v. O'Brien*, 391 U.S. 367 (1968).

I have already independently concluded that A3371 regulates conduct, not speech, and thus I need not devote much time to Plaintiffs' argument that the *Pickup* panel, in its analysis of whether SOCE therapy is conduct, not speech, erred when harmonizing the Ninth Circuit's previous holdings in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) ("*NAAP*"), and *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).  Ninth Circuit law is not binding on this Court, and I am under no obligation to interpret and resolve issues internal to that circuit's jurisprudence.  *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010).  Indeed, in the absence of controlling authority, I am free to adopt whatever reasoning I find persuasive from another jurisdiction's decision, while rejecting contrary reasoning from that same jurisdiction—regardless of whether the reasoning I rely on is binding in that jurisdiction.  *See Barrios v. Attorney General of the United States*, 339 F.3d 272, 277 (3d Cir. 2005) (finding persuasive reasoning of dissenting Ninth Circuit opinion while rejecting majority's reasoning from same opinion).  In that connection, I briefly highlight certain observations and conclusions in *Pickup* that I find persuasive here.

To begin, the Ninth Circuit, in *Pickup,* aptly explained that "the key component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech.  That psychoanalysts employ speech to treat their

clients does not entitle them, or their profession, to special First Amendment protection." *Pickup*, 728 F.3d at 1052 (quoting *NAAP*, Thus, the *Pickup* panel endorsed the principle that "the communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.* However, the *Pickup* panel clarified that the Ninth Circuit had "neither decided how *much* protection that communication should receive nor considered whether the level of protection might vary depending on the function of the communication." *Id.*

The *Pickup* panel distilled several principles applicable to the state's authority and limits in regulating the therapist-client relationship:

> (1) doctor-patient communications *about* medical treatment receive substantial First Amendment protection, but the government has more leeway to regulate the conduct necessary to administering treatment itself; (2) psychotherapists are not entitled to special First Amendment protection merely because the mechanism used to deliver mental health treatment is the spoken word; and (3) nevertheless, communication that occurs during psychotherapy does receive *some* constitutional protection, but it is not immune from regulation.

*Id.*

Although to some extent Plaintiffs take issue with all three of these "principles," the most salient to their challenge in this case is the second— that psychotherapists are not entitled to special First Amendment protection merely because they use the spoken word as therapy. *See, e.g.*, Pl. Reply at 2. This argument is merely a corollary of Plaintiffs' contention that "counseling," by its very nature, is constitutionally protected speech. I

36

have already explained why this is not so for the purposes of A3371. The same rationale extends to why psychotherapists, and other similarly regulated professionals, are not entitled to blanket First Amendment protection for any and all conversations that occur in the counselor-client relationship. To be clear, the line of demarcation between conduct and speech is whether the counselor is attempting to communicate information or a particular viewpoint to the client or whether the counselor is attempting to apply methods, practices, and procedures to bring about a change in the client—the former is speech and the latter is conduct.

However, there is a more fundamental problem with Plaintiffs' argument, because taken to its logical end, it would mean that *any* regulation of professional counseling necessarily implicates fundamental First Amendment free speech rights, and therefore would need to withstand heightened scrutiny to be permissible. Such a result runs counter to the longstanding principle that a state generally may enact laws rationally regulating professionals, including those providing medicine and mental health services. *See Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."); *see also Dent v. West Virginia*, 129 U.S. 114 (1889) (holding that states have a legitimate interest in regulating the medical profession through doctors' licensing requirements); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348

U.S. 483 (1955) (finding it constitutionally permissible for states to require a prescription for opticians to fit or duplicate lenses); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) (noting that "the State bears a special responsibility for maintaining standards among members of the licensed professions"); *Eatough v. Albano*, 673 F.2d 671, 676 (3d Cir. 1982) ("It is long settled that states have a legitimate interest in regulating the practice of medicine . . . ."); *Lange-Kessler v. Dep't of Educ. of the State of New York*, 109 F.3d 137 (2d Cir. 1997) (finding that regulation of the medical profession is afforded rational basis review); *cf. Washington v. Glucksberg*, 521 U.S. 702, 731 (1997) ("The State also has an interest in protecting the integrity and ethics of the medical profession."); *Sammon v. New Jersey Bd. of Med. Examiners*, 66 F.3d 639, 645 & nn. 9-10 (3d Cir. 1995) (rejecting argument that choice of provision of medical services is a constitutionally significant interest triggering strict scrutiny review).

Finally, I address Plaintiffs' reliance on *Wollschlaeger v. Farmer*, in which the court found that a Florida law preventing doctors from inquiring into a patient's gun ownership invaded the constitutionally protected realm of doctor-patient communications.[19]  880 F. Supp. 2d 1251, 1266-67 (S.D. Fla. 2012).  The *Wollschlaeger* court relied on the proposition that "[c]ourts have recognized that the free flow *of truthful, non-misleading*

---

[19]    The *Wollschlaeger* court relied on evidence that "as part of the practice of preventive medicine, practitioners routinely ask and counsel patients about a number of potential health and safety risks," including firearms, and that the Florida law "interfere[d] in the doctor-patient relationship and ha[d] resulted in diminished efficacy of [physicians'] practice of preventive medical care."  880 F. Supp. 2d at 1257.

*information* is critical within the doctor-patient relationship," *id.* at 1266, and cited *Trammel v. United States*, 445 U.S. 40, 51 (1980) ("[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."), *Conant*, 309 F.3d at 636 ("An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients."), and *Sorrell v. IMS Health, Inc.*, 131 S.Ct. 2653, 2664 (2011) ("A consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. . . . That reality has great relevance in the fields of medicine and public health, where information can save lives."). In contrast here, A3371 does not seek to regulate the conveying of information, only the application of a particular therapeutic method. Thus, *Wollschlaeger* is inapposite.[20]

---

[20]    Furthermore, here, the State has determined that the potential harm to minors from SOCE, however slight, is sufficient to outweigh any potential benefits. In that connection, I note that Plaintiffs themselves acknowledge that there is a dearth of non-anecdotal evidence to support the success rate, and benefits of SOCE. Thus, unlike the Florida law precluding doctors from ascertaining medically relevant information from their patients, the circumstances here are more akin to a state finding physician assisted suicide to be harmful and enacting a law to prohibit its practice. Because there is no constitutional right to practice a particular type of medical or mental health treatment, A3371's prohibition of a particular form of counseling in which counselors apply therapeutic principles and procedures similarly does not implicate fundamental constitutional rights. *See Washington*, 521 U.S. at 728 ("[T]he asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause."); *Sammon v. New Jersey Bd. of Med. Examiners*, 66 F.3d 639, 645 & nn.9-10 (3d Cir. 1995) (rejecting argument that choice of provision of medical services is a constitutionally significant interest triggering strict scrutiny review).

For the foregoing reasons, I conclude that A3371 on its face does not target speech, and "counseling" is not entitled to special constitutional protection merely because it is primarily carried out through talk therapy. Thus, I find that A3371 does not seek to regulate speech; rather the statute regulates a particular type of conduct, SOCE counseling.

### B.   Level of Scrutiny – Rational Basis Review Applies

Having determined that A3371 regulates conduct, I must still determine if the statute carries with it any incidental effect on speech. Plaintiffs argue that because the conduct being regulated by A3371—SOCE counseling—is carried out entirely through speech, the statute necessarily has, at the very least, an incidental effect on speech and thus, a heightened level of judicial scrutiny applies.[21]  *See* Pl. Reply at 8.  In that connection, Plaintiffs assert that under Third Circuit precedent, a law that "burdens expression but is content neutral" must be analyzed under the "intermediate scrutiny" standard enunciated by the Supreme Court in *O'Brien.  See Conchata Inc. v. Miller*, 458 F.3d 258, 267 (3d Cir. 2006);

---

[21]     Plaintiffs similarly challenge the *Pickup* panel's conclusion that the California law, SB 1172, needed only to survive rational basis review. According to Plaintiffs, the *Pickup* court erred by not applying *O'Brien's* intermediate scrutiny test after finding that "any effect [SB 1172] may have on free speech interests is merely incidental."  *Pickup*, 728 F.3d at 1056. Likewise, Plaintiffs contend that that the State here also conceded in its papers that A3371 has an incidental burden on speech.  Plaintiffs' argument is misplaced; neither the *Pickup* panel, in connection with SB 1172, nor the State, in connection with A3371, expressly acknowledged that the respective statutes actually had an effect on speech.  Rather, both the Ninth Circuit and the State noted that *if* there is an effect on speech, it is no more than incidental.  *See id.*; Def. Opp. at 15.  In any event, as explained by the analysis that follows, I find that A3371 does not have an effect on speech that would trigger constitutional concerns.

*Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) *aff'd*, 532 U.S. 514 (2001) (noting that *O'Brien* standard applies to regulations governing conduct that incidentally restrict expressive behavior).   In response, Defendants argue that the mere fact that the conduct in question here is carried out through spoken words is not, by itself, sufficient to show that the statute has an incidental burden on speech; rather, Plaintiffs must also show that their conduct is inherently expressive, which they fail to do.

In *O'Brien*, the Supreme Court addressed a federal law that made it a criminal offense to forge, alter, knowingly destroy, knowingly mutilate, or in any manner change a draft card.  *O'Brien*, 391 U.S. at 370.  The petitioner had been convicted for burning his draft card on the steps of a court house, and appealed his conviction on the grounds that the law unconstitutionally abridged his freedom of speech.  *Id.*  As an initial matter, the Supreme Court found that the statute "on its face deals with conduct having no connection with speech.  It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct."  *Id.* at 375. However, the *O'Brien* court recognized that the petitioner had burned his draft card to protest the Vietnam War, and accordingly, determined that this "*communicative element* in O'Brien's conduct [was] sufficient to bring into play the First Amendment."  *Id.* at 376 (emphasis added).  The Supreme Court reasoned that the federal law was constitutionally permissible, notwithstanding its incidental effect on individuals like the petitioner, explaining that "when 'speech' and 'nonspeech' elements are

41

combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."[22] *Id.*

Thus, the inquiry into whether *O'Brien*'s intermediate scrutiny review is appropriate turns on whether the alleged conduct falls within the scope of the First Amendment's right to freedom of expression, and extends only to "conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative [as] [s]ymbolic expression, otherwise known as expressive conduct." *Bartnicki*, 200 F.3d at 121 (internal quotation marks omitted) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

On the other hand, as I have noted herein, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney*, 336 U.S. at 502. Similarly, "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik*, 436 U.S. at 456. Thus, in determining whether conduct is deserving of First Amendment speech protection, the focus is on "the nature of [the] activity,

---

[22]   Ultimately, the *O'Brien* court found that the government's interest in preventing the destruction of draft cards was sufficiently important, and unrelated to the suppression of free expression, to justify the federal law. *O'Brien*, 391 U.S. at 376.

combined with the factual context and environment in which it was undertaken," to determine whether "activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. State of Washington*, 418 U.S. 405, 409-10 (1974).  In making that connection, the Supreme Court has "rejected the view that conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea [and has] extended First Amendment protection only to conduct that is *inherently expressive*." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 65-66 (2006) (other internal quotation marks omitted).  Thus, contrary to Plaintiffs' argument, the mere fact that counseling is carried out through speech is not alone sufficient to show that A3371 has an incidental effect on speech.  Plaintiffs must also show that counseling is inherently expressive conduct—*i.e.*, that talk therapy (1) is intended to be communicative, and (2) would be understood as such by their clients.[23]  Plaintiffs fail to make such a showing.

Plaintiffs themselves discuss SOCE as a type of therapy, intended to bring about some form of change in the client.  *See, e.g.*, Decl. of Dr. Tara King, ¶ 12 (discussing SOCE as a form of counseling involving the "traditional psychodynamic process" to effect "change" in the client's sexual orientation); Decl. of Dr. Ron Newman, ¶ 8 ("I also believe that

---

[23]    The Third Circuit has explained that Plaintiffs have the burden of showing whether conduct is expressive. *See Troster v. Pennsylvania State Dep't of Corr.*, 65 F.3d 1086, 1090 (3d Cir. 1995).

change is possible and have personally counseled individuals who have successfully reduced or eliminated their unwanted same-sex attractions, behaviors, or identity."); Decl. of Dr. Joseph Nicolosi, ¶ 11 (discussing SOCE as a means to eliminate or reduce a client's unwanted same-sex sexual attractions).[24] Here, Plaintiffs' explanation of their roles and boundaries in the counselor-client relationship leads to the conclusion that counseling is not "conduct that is intended to be communicative" because the counselor's goal is to apply traditional mental health treatment methods and principles to effect a change in the client's sexual orientation. SOCE counseling is not a means of communication to express any particular viewpoint; rather it is a means of treatment intended to bring about a change in the mental health and psyche of the client who desires and seeks out such a change.   I therefore do not find that SOCE counseling, as performed by Plaintiffs, satisfies the *Bartnicki* requirement of conduct that is intended to be communicative.

Moreover, SOCE counseling is not like other forms of conduct traditionally found to be "inherently expressive," such as the burning of a draft card in *O'Brien* or the burning of a flag in *Texas v. Johnson*, 491 U.S.

---

[24] Moreover, Plaintiffs repeatedly point out that they only engage in SOCE with clients who approach them seeking such a change; indeed, Plaintiffs explain that it would be unethical for them to try to impose their own personal viewpoint on a client. *See, e.g.*, Decl. of Dr. Tara King, ¶ 10 ("It is unethical to attempt to impose any kind of ideology or framework on a client in counseling, so I do not even raise SOCE discussions unless a client wants to engage in such counseling."); *id.*, ¶¶ 12-13; Decl. of Dr. Joseph Nicolosi, ¶¶ 7-8.

397, 405-406 (1989).[25]   In these cases, there was a clear distinction between the conduct that the statute sought to govern and the expressive conduct incidentally affected by the statute.  Here, by contrast, Plaintiffs have identified no conduct, let alone any expressive conduct, other than that covered by A3371.  Thus, Plaintiffs' claim is more appropriately governed by *Giboney*, which affords no protection to speech that is integrally part of validly prohibited conduct.  *Giboney,* 336 U.S. at 498 ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of

---

[25]     In *Bartnicki v. Vopper,* 200 F.3d at 120, *aff'd*, 532 U.S. 514 (2001), the Third Circuit provided cited several examples of Supreme Court cases addressing expressive conduct.  *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560 (1991) (reversing circuit court decision finding Indiana statute prohibiting complete nudity in public places not an unconstitutional abridgement of First Amendment speech rights related to exotic dancing); *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705 (1986) (holding that "unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case manifests absolutely no element of protected expression" and thus statute authorizing closure of premises did not implicate First Amendment concerns.); *United States v. Albertini,* 472 U.S. 675 (1985) (finding federal statute making it unlawful to reenter a military base after having been barred by the commanding officer did not implicate First Amendment concerns because "the First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interest"); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293-299 (1984) (assuming without deciding that overnight camping in connection with a demonstration was expressive conduct, but nevertheless concluding that National Park Service regulation prohibiting camping in Lafayette Park did not violate the First Amendment); *R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992) (Minnesota statute prohibiting display of certain objects, including a burning cross or Nazi swastika, improperly regulated expressive conduct and violated the First Amendment because it was not narrowly tailored).   Significantly, all of these cases concern expressive conduct different than the actual conduct the statute or regulation seeks to prohibit.

conduct in violation of a valid criminal statute. We reject the contention now."); *Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny supports such a result."); *United States v. Schiavo*, 504 F.2d 1, 21 n.9 (3d Cir. 1974) ("Freedom of expression can be suppressed if, and to the extent that, it is so brigaded with illegal action as to be an inseparable part of it."). Similarly, I find that Plaintiffs have not shown that A3371 has an incidental effect on expressive conduct, and thus, *O'Brien* does not govern Plaintiffs' challenge to A3371. Instead, I apply rational basis review. *See Sammon*, 66 F.3d at 645 & nn.9-10.

"Where rational basis review is appropriate, a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute."[26] *Sammon*, 66 F.3d at 644; *see Scavone v. Pa. State Police*, 501 F. App'x 179, 181 (3d Cir. 2012). "'The law need not be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular

---

[26]    Because I have rejected Plaintiffs' First Amendment free speech challenge, my analysis here turns on whether there is any substantive due process violation.

legislative measure was a rational way to correct it.'" *Rogin v. Bensalem Township*, 616 F.2d 680, 689 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487-88 (1955)); *see also Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir. 1991), *cert. denied*, 503 U.S. 984 (1992); *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 876 (3d Cir. 2012). When legislation is being tested under rational basis review, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker."[27] *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)); *see also Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1034-35 (3d Cir.), *cert. denied*, 482 U.S. 906 (1987). Indeed, "those attacking the rationality of the legislative classification have the burden 'to negat[e] every conceivable basis which might support it.'" *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v.*

---

[27]    The Third Circuit has repeatedly cautioned that a court engaging in rational basis review is not entitled

> to second guess the legislature on the factual assumptions or policy considerations underlying the statute. If the legislature has assumed that people will react to the statute in a given way or that it will serve the desired goal, the court is not authorized to determine whether people have reacted in the way predicted or whether the desired goal has been served.

*Sammon*, 66 F.3d at 645. Thus, the sole question is "whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served." *Scavone*, 501 F. App'x at 181.

*Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see, e.g.*, *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (finding that laws scrutinized under rational basis review are "accorded a strong presumption of validity"). Ordinarily, that burden is nearly insurmountable. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotation marks and citations omitted); *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 399 (3d Cir. 2012).

Importantly, a state need not provide justification or rationale for its legislative decision. Indeed, the Supreme Court has held that "legislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, 508 U.S. at 315; *N.J. Retail Merchs.*, 669 F.3d at 399. It is not the courts' role, under a rational basis review, "'to judge the wisdom, fairness, or logic of legislative choices.'" *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009) (quoting *Beach Commc'ns*, 508 U.S. at 313). Nevertheless, the court must still determine "whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." *Nebbia v. New York*, 291 U.S. 502, 536 (1934).

Here, the State's professed interest is in protecting minors from professional counseling it deems harmful.  It is beyond debate that the State has an interest in protecting vulnerable groups, *Washington*, 521 U.S. at 731, which includes minors.  *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 (3d Cir. 2003) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors." (Quoting *Sable Comm'n of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).[28]  A3371 accomplishes this by ensuring that licensed professionals who engage in counseling do not perform SOCE on minors.  Contrary to Plaintiffs' arguments, it is immaterial whether there is any actual evidence of harm from SOCE; for A3371 to have a rational basis, it is sufficient that the legislature could reasonably believe that SOCE conveyed no benefits and potentially caused harm to minors.  *Beach Communications*, 508 U.S. at 315.   The legislative findings set forth in A3371 support such a conclusion.  *See generally* N.J.S.A. 45:1-54.  For example, the legislature found:

- "Being lesbian, gay, or bisexual is not a disease, disorder, illness, deficiency, or shortcoming";
- "[S]exual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people";
- "[T]he [American Psychological Association] advises parents, guardians, young people, and their families to avoid sexual orientation change efforts that portray homosexuality as a mental illness or developmental disorder";

---

[28]   Beyond that, the Supreme Court has recognized that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance," *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996), and that states also have "an interest in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. at 731.

- "The American Academy of Pediatrics in 1993 published an article in its journal, Pediatrics, stating: 'Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation'"; and
- "The American Academy of Child and Adolescent Psychiatry in 2012 published an article in its journal, Journal of the American Academy of Child and Adolescent Psychiatry, stating: 'Clinicians should be aware that there is no evidence that sexual orientation can be altered through therapy, and that attempts to do so may be harmful . . . .'"

*Id.* It is also immaterial that some of the legislature's findings and declarations address SOCE with respect to adults, as opposed to minors. It is certainly rational for the legislature to believe that the potential harms that attend SOCE for adults exist at least equally for minors. *See Scavone*, 501 Fed. Appx. at 181 (explaining the rational basis inquiry as "whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served"). Finally, because in applying the rational basis test I rely only on the legislature's stated findings to determine whether there is a rational basis for A3371—indeed, I need not even rely on those findings, as long as I can conceive of some rational basis for the statute—Plaintiffs' arguments attacking the validity of the studies and reports relied on by the legislature carry no weight in the analysis.[29]   *See N.J. Retail Merchs.*, 669 F.3d at 399; *Beach Communications*, 508 U.S. at 315.

---

[29]   For that reason, I need not consider the additional evidentiary submissions filed by Plaintiffs and Intervenor, and thus I need not rule on their admissibility.  *See supra,* f.n. 15.

Similarly, A3371's prohibition on the practice of SOCE counseling is rationally related to the harm the statute seeks to prevent.  A3371 targets only licensed professionals who engage in professional counseling of minors, and restricts them from performing the specific type of conduct— SOCE counseling—the legislature deemed harmful.  This nexus is more than adequate to satisfy rational basis review.  *Id.*

In sum, I conclude that: (1) A3371 on its face does not target speech; (2) "counseling" is not constitutionally protected speech merely because it is primarily carried out through talk therapy; (3) no speech or expressive conduct is incidentally burdened by A3371's prohibition, and thus (4) rational basis review is appropriate for adjudging the statute's constitutionality, which is easily satisfied by the stated legislative findings and the statute's purpose.

### C.      A3371 is Neither Vague Nor Overbroad

In connection with their free speech challenge, Plaintiffs also assert that A3371 is both unconstitutionally vague and overbroad.  These arguments are grounded in Plaintiffs' contention that A3371 regulates speech.  Having determined that A3371 covers conduct only, the majority of Plaintiffs' arguments in this regard no longer apply.  I nevertheless address whether, as an otherwise constitutionally permissible, rational regulation of conduct, A3371 is impermissibly vague or overbroad.

#### 1.      Vagueness

Plaintiffs contend that A3371 is unconstitutionality vague because Plaintiffs do not know what type of speech or conduct is actually

prohibited by the statute.  The "vagueness inquiry is grounded in the notice requirement of the Fourteenth Amendment's due process clause." *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  A statute will be considered void for vagueness if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement.  *Id.*; *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."   *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (citations omitted).  Indeed, voiding a democratically enacted statute on grounds that it is unduly vague is an extreme remedy.  *Id.*  More particularly, a facial vagueness attack on a statute that does not infringe on constitutionally protected freedoms—as is the case in this matter—can succeed only if the statute is incapable of any valid application.  *Steffel v. Thompson*, 415 U.S. 452, 474 (1974); *Village of Hoffman Estate v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495-95 (1982); *Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) ("[A] successful facial challenge requires the challenger to establish that no set of circumstances exists under which the Act would be valid." (internal quotation marks omitted.)); *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (explaining that a statute will survive a facial vagueness challenge so long as "it is clear what the statute proscribes in the vast majority of its intended applications").  In that regard, it is significant to bear in mind that speculation about possible or

hypothetical applications does not suffice; a statute that is valid "in the vast majority of its intended applications" cannot be struck down on a facial challenge. *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

Moreover, in the context of a statutory proscription that purports to regulate a targeted industry or profession, a slightly different type of analysis applies: "if the statutory prohibition involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, *the standard is lowered* and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993) (emphasis added) (quoting *Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n*, 620 F.2d 900, 907 (1st Cir. 1980), in turn quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (internal quotations omitted)); *cf. Village of Hoffman Estate*, 455 U.S. at 498 ("[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because . . . the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.").

Plaintiffs contend that the term "sexual orientation" and the phrase "sexual orientation change efforts" are impermissibly vague.  The latter challenge can be quickly dismissed, as it is based on, and significantly overlaps with, Plaintiffs' substantive free speech challenge.   Indeed,

Plaintiffs' primary theory in this case is that it is unclear whether under A3371 Plaintiffs can talk *about* SOCE to their clients, even if they are not engaging in actual SOCE.  Plaintiffs thus argue that A3371 burdens speech because Plaintiffs will either be chilled from, or disciplined for, merely speaking about SOCE.  As my earlier discussion makes clear, the reasonable reading of A3371, as well as the State's position throughout this litigation, limits the application of the statute to the actual practice of SOCE.  This limitation resolves Plaintiffs contention that SOCE, as a phrase, is unconstitutionally vague.

The statute defines SOCE by providing an illustrative list of practices: "'sexual orientation change efforts' means the practice of seeking to change a person's sexual orientation, including, but not limited to, efforts to change behaviors, gender identity, or gender expressions, or to reduce or eliminate sexual or romantic attractions or feelings toward a person of the same gender."[30]  N.J.S.A. 45:1-55(b).  Given this definition, it cannot be said that the statute does not allow a person of ordinary intelligence to determine what conduct it prohibits, and therefore it is not facially vague.

Nothing in A3371 prevents a counselor from mentioning the existence of SOCE, recommending a book on SOCE or recommending

---

[30]      The statute further provides that "'[s]exual orientation change efforts' shall not include . . . counseling that (1) provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, and (2) does not seek to change sexual orientation." N.J.S.A. 45:1-55(b).

SOCE treatment by another unlicensed person such as a religious figure or recommending a licensed person in another state. The statute does not require affirmation of a patient's homosexuality. Even if, "at the margins," there is some conjectural uncertainty as to what the statute proscribes, such uncertainty is insufficient to void the statute for vagueness because "it is clear what the statute proscribes in the vast majority of its intended applications," namely counseling intended to alter a minor patient's sexual orientation. *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill*, 530 U.S. at 733). Moreover, Plaintiffs are licensed professionals who engage in counseling, and if some Plaintiffs are not familiar with *how* to practice SOCE, Plaintiffs have never suggested that they, or any person who professionally counsels, is wholly unfamiliar with the *idea* of SOCE.[31] *See Weitzenhoff*, 35 F.3d at 1289. Thus, Plaintiffs' facial vagueness attack on the term "sexual orientation change efforts" is without merit.

Plaintiffs also challenge the term "sexual orientation," noting that it is undefined in the statute, and citing the APA Task Force that explained

---

[31]     For similar reasons, I reject Plaintiffs' reliance on *Keyishian v. Board of Regents of University of State of N.Y.*, 385 U.S. 589, 599 (1967), which held that a statute prohibiting employing any teacher who "advocates, advises, or teaches the doctrine of forceful overthrow of the government" was unconstitutionally vague because "[i]t w[ould] prohibit the employment of one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others." *Id*. *Keyishian* is easily distinguished from this case; Plaintiffs, as admitted practitioners of SOCE, cannot claim that the phrase "sexual orientation change efforts" creates uncertainty as to what a therapist can and cannot do, as was the case for teachers in *Keyishian*. Indeed, A3371 expressly targets a specific form of therapy known to the community in which it is practiced. *See Pickup,* 2012 WL 6021465, at *14.

that "[s]ame-sex sexual attractions and behavior occur in the context of a variety of sexual orientations . . . and . . . is fluid or has an indefinite outcome."  Plaintiffs reason that because the term "sexual orientation" has subjective and interchanging meanings, its usage in the challenged statute makes the statute vague.  I am not persuaded that the term "sexual orientation" is unconstitutionally vague.

Plaintiffs, in their own declarations, demonstrate that they understand what the term sexual orientation means and how that term relates to the conduct prohibited by A3371.  *See, e.g.*, Decl. of Dr. Tara King, ¶ 4 ("We offer counseling on numerous issues, including . . . sexual orientation change efforts") *id.*, ¶ 5 ("I am *a former lesbian* who went through SOCE counseling." (Emphasis added.); Decl. of Dr. Ron. Newman, ¶ 8 ("Part of my practice involves what is often called sexual orientation change efforts.").  Indeed, Plaintiffs are bringing this suit precisely because they wish to engage in SOCE.  For Plaintiffs to argue on the one hand that their ability to engage in SOCE is impermissibly restricted by A3371, and on the other hand claim that A3371 is unconstitutionally vague because it fails to define "sexual orientation" strains credulity.  Regardless, because I find that a person of ordinary intelligence—let alone Plaintiffs—would understand what the term sexual orientation means, A3371 is not vague for the inclusion of this term.[32]

---

[32]      For the same reason, I am unpersuaded by Plaintiffs' reliance on the recent revision of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Health Disorders, DSM-V.  *See* Pl. Supp. Authority, Dkt. No. 55.  According to Plaintiffs, the DSM-V initially

Canvassing case law on this subject, I have found several courts that have determined that the term sexual orientation is not unconstitutionally vague. *See Hyman v. City of Louisville*, 132 F. Supp. 2d 528, 545-47 (W.D. Ky. 2001) (relying on Black's dictionary definition, rejecting vagueness challenge to statute banning discrimination on the basis of sexual orientation), *rev'd on other grounds*, 53 Fed. Appx. 740 (6th Cir. 2002); *United States v. Jenkins*, 909 F. Supp. 2d 758, 778-79 (E.D. Ky. 2012). Most recently, the Ninth Circuit reached the same conclusion in *Pickup*, 728 F.3d. at 1059 ("Neither is the term 'sexual orientation' vague. Its meaning is clear enough to a reasonable person and should be even more apparent to mental health providers."). Likewise, the Supreme Court issued an opinion last term on the constitutionality of Section Three of the Defense of Marriage Act, 1 U.S.C. § 7, dealing with the Federal government's authority to define marriage, for federal law purposes, as between members of the opposite sex and to the exclusion of those of the same sex. *See United States v. Windsor*, ___ U.S. ___, 133 S.Ct. 2675 (2013). In discussing the issue of same-sex marriages, the majority and dissenting opinions employed the term "sexual orientation" several times; significantly, none of the authors of these opinions felt it necessary to

---

classified pedophilia as "sexual orientation," but then later changed the classification to "sexual interest," which Plaintiffs claim shows that the definition of sexual orientation is constantly changing. As the State correctly points out, and indeed, Plaintiffs' own filing shows, the APA released a statement explaining that the initial classification of pedophilia as a sexual orientation was merely a typographical error. Thus, Plaintiffs' claim that sexual orientation lack clear definition based on the DSM-V is meritless, and in fact, borders on being frivolous.

define this term.  Accordingly, I am not persuaded that the term "sexual orientation" is vague to the reasonable individual—and particularly not to mental health counselors—and thus, Plaintiffs' vagueness challenge is dismissed.

### 2.     Overbreadth

Plaintiffs lastly raise an overbreadth claim to A3371 as part of their First Amendment free speech challenge to the statute.   Under the overbreadth doctrine, a law affecting speech will be deemed invalid on its face if it prohibits "a substantial amount of constitutionally protected speech." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987).  In contrast, "where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).  In such cases, "the mere fact that one can conceive of *some* impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) (emphasis added). Thus, as was the case with their vagueness challenge, much of Plaintiffs' overbreadth argument is premised on A3371 being a statute that restricts or incidentally burdens speech.   Having found that the statute only regulates conduct, and not speech in any constitutionally protected form, Plaintiffs' arguments regarding the statute's overbreadth are largely irrelevant.

Moreover, the overbreadth doctrine is more appropriately raised by a party "whose own activities are unprotected . . . [to] challenge a statute by showing that it substantially abridges the rights *of other parties not before the Court*." *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980) (emphasis added).  Under this principle, courts should be reluctant to entertain a facial overbreadth challenge "where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish."  *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985).  As one court in this district has explained:

> Unless it appears that "*any attempt to enforce*" the challenged legislation "would create an unacceptable risk of the suppression of ideas," a court should declare an entire statute invalid on its face only if the record indicates that the challenged statute will have a different impact upon third parties not before the court than it has upon the plaintiffs.

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 902 F. Supp. 492, 517 (D.N.J. 1995) (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)), *aff'd sub nom.*, P*resbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101 (3d Cir. 1996); *see also id.* ("Courts should not engage in overbreadth analysis where a plaintiff claims that a statute is overbroad precisely because it applies to him." (citing *Moore v. City of Kilgore*, 877 F.2d 364, 390-92 (5th Cir. 1989))).

Here, the State has represented throughout this litigation that it only intends to enforce A3371 against licensed professionals who actually

conduct SOCE as a method of counseling, not against those who merely discuss the existence of SOCE with their clients.   Because A3371 is constitutional with respect to its prohibition of the practice of SOCE, as explained *supra* in this Opinion, there exists at least one constitutional means of enforcing the statute.   Thus, on this basis alone, Plaintiffs' overbreadth challenge fails.   *Florio*, 902 F. Supp. at 517.   For similar reasons, I also find that A3371 does not encroach on any protected First Amendment speech, as the statute by its own terms seeks to regulate the "practice" of SOCE by a licensed professional, and not any speech, public or private, by that professional or other individuals; thus there is not a "real, but substantial" risk of overbreadth when A3371 is "judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 613.   Accordingly, Plaintiffs have not shown that A3371 is unconstitutionally overbroad, and Count I is dismissed.

## VI.   First Amendment – Free Exercise of Religion

Plaintiffs maintain that in addition to their speech being unlawfully constrained, A3371 infringes on their First Amendment right to exercise their sincerely held religious beliefs that changing same-sex attraction or behavior is possible.   Therefore, Plaintiffs reason, A3371 imposes a substantial burden on those religious beliefs because it prohibits them from providing spiritual counsel and assistance on the subject matter of same-sex attractions.   Plaintiffs' arguments fare no better under this theory.

Under the First Amendment, "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof." *Conestoga Wood Specialties Corp. v. Sec'y of the United States HHS*, 724 F.3d 377, 382-83 (3d Cir. 2013). It is well-settled that, at its core, the Free Exercise Clause protects religious expression; however, it does not afford absolute protection. *See McTernan v. City of York*, 577 F.3d 521, 532 (3d Cir. 2009). Rather, where a law is "neutral and of general applicability[,]" it "need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice*." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citations omitted); *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 890 (1990); *Storeman, Inc. v. Selecky*, 586 F.3d 1109, 1128 (9th Cir. 2012) ("right to freely exercise one's religion . . . does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes conduct that his religion prescribes.'"). If, on the other hand, the government action is not neutral and generally applicable, strict scrutiny applies, and the government action violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002).

Government action is not neutral and generally applicable if it burdens religious conduct because of its religious motivation, or if it

burdens religiously motivated conduct but exempts substantial comparable conduct that is not religiously motivated. *See Hialeah*, 508 U.S. at 543-46; *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004); *Lukumi*, 508 U.S. at 543-46; *FOP Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364-66 (3d Cir. 1999). On the other hand, "[a] law is 'neutral if it does not target religiously motivated conduct [whether] on its face or as applied in practice." *Conestgoa Wood Specialties Corp. v. Sebelius*, 917 F.Supp. 2d 394, 410 (E.D. Pa. 2012). Further, when the law is neutral, the government cannot advance its interests solely by targeting religiously motivated conduct. Instead, the regulation must be generally applicable. *See Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 242 (3d Cir. 2008).

Here, A3371 makes no reference to any religious practice, conduct, or motivation. Therefore, on its face, the statute is neutral. Plaintiffs argue that the provisions of A3371 will disproportionately affect those motivated by religious belief because A3371 effectively engages in impermissible "religious gerrymandering" by providing individualized exemptions from the general prohibitions. Plaintiffs identify these categories of exemptions: (1) minors seeking to transition from one gender to another; (2) minors struggling with or confused about heterosexual attractions, behaviors, or identity; (3) counseling that facilitates exploration and development of same-sex attraction, behaviors, or identity; (4) individuals over the age of 18 who are seeking to reduce or eliminate same-sex attraction; and (5) counseling provided by unlicensed

persons.  Contrary to Plaintiffs' contentions, A3371 is one of generally applicability, and therefore, it is only subject to a rational basis test.

To begin, there can be no serious doubt that the Legislature enacted A3371 because it found that SOCE "poses critical health risks" to minors. *See* N.J.S.A. 45:1-54. By doing so, the Legislature exercised its regulatory powers to prohibit licensed mental health professionals in New Jersey from engaging in SOCE.  There is no indication in the record that religion was a motivating factor in the passage of A3371.  In fact, Plaintiffs have not suggested that the Legislature was motivated by any religious purpose. From its plain language, the law does not seek to target or burden religious practices or beliefs.   Rather, A3371 bars all licensed mental health providers from engaging in SOCE with minors, regardless of whether that provider or the minor seeking SOCE is motivated by religion or motivated by any other purpose.  Plainly, A3371 is neutral in nature.  *See Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir. 2009) (finding no Free Exercise violation where challenged restrictions on protests near abortion clinic "app[lied] irrespective of whether the beliefs underpinning the regulated expression are religious or secular").  Because of the statute's neutrality, even if A3371 disproportionately affects those motivated by religious belief, this fact does not raise any Free Exercise concerns. *Lukumi*, 508 U.S. at 581 ("a law that is neutral . . . need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").

The statute is also generally applicable because A3371 does not suppress, target, or single out the practice of any religion because of religious conduct.  At the outset, the Court disagrees with Plaintiffs' characterization that A3371 carves out certain exceptions.  Rather, those "exemptions" are areas that A3371 does not seek to regulate because they fall outside the purpose of the statute.  Nevertheless, addressing Plaintiffs' arguments, the "exemptions" to which Plaintiffs point do not undermine the purposes of the law.  According to Plaintiffs, the first "exemption" in A3371 is for "counseling for a person seeking to transition from one gender to another"; that is, counseling not related to changing sexual orientation or gender identity, but toward assisting someone seeking to live consistently with his or her gender identity.  This exemption does not undermine the purposes of A3371.  In fact, it is consistent with the Legislature's concern that conversion therapy is harmful.  Next, that unlicensed counselors are not covered by the statute also does not undermine the purpose of the statute. As the Court has discussed earlier, pursuant to its police power, the State only aimed to regulate those professionals who are licensed.  Stated differently, it is the State's role to regulate its professionals -- medical or otherwise -- and therefore, because unlicensed professionals do not fall within the State's comprehensive regulatory schemes, this type of "exemption" neither undermines the statute's purpose nor does it somehow change the statute's general applicability.

Moreover, to the extent that the Legislature distinguished between SOCE provided to minors and adults, this distinction does not render the law not generally applicable.  Indeed, because the Legislature determined, pursuant to its regulatory powers, that SOCE treatment poses serious health risks to minors, the limited reach of the statute does not change the nature of the statute, particularly in light of the fact that the Legislature has a strong interest in protecting minors, a vulnerable group in society. *See*, *supra*, p. 49.  Finally, and more importantly, A3371 does not contain a mechanism for individual exemptions nor does it exempt a substantial category of conduct that is not religiously motivated from its prohibition on the practice of SOCE.  Instead, the provision prohibits all state licensed mental health providers from practicing SOCE.  Finally, A3371 does not prohibit any religious leaders, who are not licensed counselors, from practicing SOCE.  This fact further demonstrates that A3371 has no religious underpinnings and therefore, it does not selectively impose any type of burden on religiously motivated conduct.  Accordingly, A3371 is generally applicable since it does not impermissibly target any religious belief.  Based upon that finding, the rational basis test applies.  For the same reasons why A3371 passes constitutional muster for free speech purposes, it passes rational basis review in this context as well.

Lastly, Plaintiffs argue that even if A3371 is a neutral and generally applicable law, A3371 is nevertheless subject to strict scrutiny as a violation of the "hybrid rights" doctrine.  I summarily reject Plaintiffs' invitation to apply the hybrid rights doctrine, as the Third Circuit has

declined to apply this theory to Free Exercise claims.  *Brown*, 586 F.3d at 284 n.24 ("Like many of our sister courts of appeals, we have not endorsed this theory.").

Count IV of the Complaint is dismissed.

## VII.   CONCLUSION

For the reasons set forth above, Garden State's motion for permissive intervention is **GRANTED**.  Plaintiffs' motion for summary judgment is **DENIED**.  Defendants' cross motion for summary judgment is **GRANTED** in its entirety.  Accordingly, all of Plaintiffs' federal and state constitutional claims against Defendants are **DISMISSED**, and Plaintiffs have no standing to bring any third party claims on behalf of their minor clients and the clients' parents.


**DATED**: November 8, 2013            /s/         Freda L. Wolfson
                                       Freda L. Wolfson
                                       United States District Judge